SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| In the Matter of | ) Arizona Supreme Court |
| | ) No. SB-03-0015-D |
| KENNETH J. PEASLEY, | ) |
| Attorney No. 004114 | ) Disciplinary Commission |
| | ) No. 97-1909 |
| Respondent. | ) |
| _____ | ) **O P I N I O N** |

Review from Disciplinary Commission
No. 97-1909

**RESPONDENT DISBARRED**

_____

State Bar of Arizona                                              Phoenix
      By:  Karen A. Clark, Senior Bar Counsel
Attorney for State Bar of Arizona

Waterfall, Economidis, Caldwell, Hanshaw                          Tucson
& Villamana, P.C.
      By:  James W. Stuehringer
Attorneys for Kenneth J. Peasley

_____

**R Y A N**, Justice

¶1      In this lawyer disciplinary case, the State Bar filed a complaint charging Respondent Kenneth J. Peasley with misconduct in violation of the Arizona Rules of Professional Conduct.  The charges alleged that Peasley intentionally presented false testimony in the prosecution of two capital murder defendants.  After lengthy proceedings, the hearing officer found by clear and convincing evidence that Peasley intentionally violated the ethical rules.  Based upon the

presence of mitigating factors, the hearing officer recommended a sixty-day suspension along with one year of probation.

¶2       Upon review, the Disciplinary Commission adopted and incorporated the hearing officer's findings, but reached a different conclusion about various aggravating and mitigating factors.  The Commission recommended disbarment.  Peasley petitioned this court for review, which we granted because this is a matter of first impression in Arizona and of statewide importance.  We have jurisdiction under Article 6, Sections 5(4) and 5(5), of the Arizona Constitution and Arizona Rule of the Supreme Court 59(a).

**I.**

**A.**

¶3       The record before the hearing officer established the following facts.[1]  Peasley was admitted to the State Bar of Arizona on April 26, 1975.  He started his career in the Pima County Public Defender's Office, but in January 1978 he began working as a prosecutor in the Pima County Attorney's Office.  By 1992, Peasley had conducted approximately 250 felony trials, 140 of which were homicide cases.  Of the homicide trials, about sixty were capital cases.

---

[1]     We review the hearing officer's findings of fact for clear error.  Ariz. R. Sup. Ct. 59(b).

¶4        On June 24, 1992, three people were murdered during a robbery of the El Grande Market in Tucson.  The lead detective in the El Grande murder case was Joseph Godoy.  Detective Godoy had been with the Tucson Police Department for twelve years and had worked in homicide for several years before the El Grande murders.  Peasley was the issuing attorney in the El Grande homicides, which meant that he went to the crime scene, received all the police reports, and decided who would be charged and with what crimes they would be charged.  Godoy and Peasley were good friends.

¶5        On August 26, 1992, an attempted robbery and shootout occurred at a pizza restaurant in Tucson.  Although another detective was assigned to this case, the names of the eventual defendants in the El Grande case arose in connection with the investigation of the pizza restaurant case.  Those suspects were Martin Soto-Fong, Andre Minnitt, and Christopher McCrimmon.

¶6        On August 31, Detective Godoy received information from an anonymous source that a Martin Soto was involved in the El Grande murders.  That same day, Mr. Gee, the owner of the El Grande Market, told Godoy that a Martin Fong was a former employee.  Also, on August 31, another detective told Godoy that one of his informants implicated "ChaChi" and Christopher McCrimmon in the El Grande murders.  That evening, Godoy determined that "ChaChi," Martin Fong, and Martin Soto were

names used by Martin Soto-Fong. In addition, on September 1, a Tucson Police Department fingerprint comparison report was completed, listing McCrimmon and Minnitt as suspects. The report identified McCrimmon's fingerprints as those found on a car near the El Grande Market. On September 2, Godoy assisted in arresting both McCrimmon and Minnitt for the robbery of the pizza restaurant. At that time, Godoy also interviewed both of them about the El Grande case.

¶7 Godoy subsequently wrote two police reports that reflected what he had learned during late August and early September in his investigation of the El Grande murder case. Specifically, those reports established that, before September 8, Godoy knew that Soto-Fong, McCrimmon, and Minnitt were the primary suspects.

¶8 On September 8, Detective Godoy interviewed an informant by the name of Keith Woods. The first part of the interview was not recorded. In the recorded portion, Woods stated that both Minnitt and McCrimmon had confessed to him that they and Soto-Fong had committed the El Grande murders. Eventually, Soto-Fong, Minnitt, and McCrimmon were charged with the murders. Peasley assumed responsibility for prosecuting the cases.

- 4 -

¶9      Peasley prosecuted Soto-Fong first in 1993.  Although the State Bar did not allege any misconduct in connection with the Soto-Fong trial, the hearing officer referred to that trial because it revealed Peasley's knowledge of when Detective Godoy knew the identities of the suspects involved in the El Grande case.  First, Peasley admitted reading Godoy's reports before the Soto-Fong trial and thus knew that Godoy considered McCrimmon and Minnitt as suspects before September 8.  Second, Peasley was present at Soto-Fong's counsel's interview of Godoy, during which the timing of Godoy's investigation was discussed.  Finally, at Soto-Fong's trial Peasley questioned Godoy about when he first met with Mr. Gee.  Godoy responded by telling the jury that he met with Mr. Gee during "the first week [of] September," when "Mr. Soto-Fong became a focus of the case." Soto-Fong was convicted and sentenced to death.  *State v. Soto-Fong*, 187 Ariz. 186, 191, 928 P.2d 610, 615 (1996).

¶10     Less than a month after the Soto-Fong trial ended, the case against McCrimmon and Minnitt went to trial before a jury. Keith Woods was a key witness for the state in the joint trial of Minnitt and McCrimmon because no direct evidence linked them

to the crime.[2]  However, Woods was a highly impeachable witness because he was a drug addict with multiple felony convictions and agreed to testify to avoid prosecution and a potentially lengthy prison sentence on another charge.  Consequently, for the jury to believe Woods, it was important that there be no suggestion that Godoy told Woods that McCrimmon and Minnitt had been involved in the El Grande murders.

¶11      To ensure that the jury believed Woods, Peasley, along with Godoy, engaged in the following conduct.  First, in his opening statement, Peasley told the jury that Detective Godoy did not learn of McCrimmon, Minnitt, or Soto-Fong before the Woods interview and that Godoy did not know Soto-Fong was a former employee of the El Grande Market before he interviewed Woods.  This statement implied to the jury that Godoy could not have told Woods who the suspects were when Godoy interviewed Woods on September 8.

¶12      Second, Detective Godoy, when questioned by Peasley, testified that he was not personally aware that one of the participants in the murder was a former employee until after he interviewed Woods and that McCrimmon and Minnitt were not

---

[2]      Peasley did not call Woods to testify at the Soto-Fong trial because Soto-Fong did not confess to Woods and because Soto-Fong's fingerprints were found at the scene.

suspects before the Woods interview.[3] During a bench conference, Peasley also told the judge that Godoy did not begin investigating McCrimmon, Minnitt, or Soto-Fong until after the Woods interview. Finally, in his closing argument, Peasley argued to the jury that Godoy did not know until the Woods interview that a former employee was involved in the murders.

¶13 The jury convicted McCrimmon and Minnitt and they were sentenced to death. Their convictions were reversed for reasons unrelated to this matter. *State v. McCrimmon*, 187 Ariz. 169, 174, 927 P.2d 1298, 1303 (1996).

¶14 After Minnitt's and McCrimmon's convictions were reversed, the cases were severed and Minnitt was retried in 1997 before a different judge, Judge Richard Nichols. During this trial, when questioned by Peasley, Detective Godoy again testified that he had not come up with the names Chris McCrimmon, Andre Minnitt, "ChaChi," Martin Fong, or Martin Soto before speaking with Woods on September 8. He emphasized that the first time he had heard those names was during that interview. In response to further questions by Peasley, Godoy also testified that he had not submitted any of the defendants' fingerprints for comparison before he interviewed Woods and that Minnitt and McCrimmon were not suspects until he had spoken with

---

[3] Both defense attorneys had copies of Godoy's reports, yet failed to impeach Godoy about what he knew before the Woods interview.

- 7 -

Woods. In his final argument, Peasley again argued that Godoy did not have Minnitt's name until after he had interviewed Woods. The retrial ended in a mistrial because the jury could not reach a verdict.

¶15 McCrimmon's defense attorney had been present during the Minnitt retrial and discovered that Peasley had introduced false testimony. During McCrimmon's second trial, which began shortly after the conclusion of Minnitt's retrial, Detective Godoy answered Peasley's questions differently than he had in the prior trials. For example, he testified that he had submitted the fingerprints before the Woods interview and that he had known the defendants' names on September 1, 1992. Defense counsel impeached Godoy with his prior testimony. In his closing argument, Peasley explained that Godoy answered the way he did in the earlier trials to protect confidential sources and avoid a mistrial. He also argued it was a "sick system" that put an officer in a position in which he had to answer the way Godoy had answered. The jury acquitted McCrimmon.

¶16 After McCrimmon's acquittal, in anticipation of a third trial, Minnitt's defense counsel filed a motion that alleged Peasley engaged in prosecutorial misconduct in the prior trial and urged the court to dismiss on the grounds of double jeopardy. Judge Nichols denied the motion but made findings about Peasley's conduct in the Minnitt retrial. He found

misconduct on Peasley's part and that it was "not merely a result of legal error, negligence, or mistake or insignificant impropriety." Judge Nichols, however, did not find that the "conduct was engaged in with the intent to further an improper purpose."

¶17      Minnitt was subsequently convicted and again sentenced to death.[4] But his conviction was overturned by this court on double jeopardy grounds. We held that the third trial should have been barred on double jeopardy grounds because of prosecutorial misconduct in the first two trials. *State v. Minnitt*, 203 Ariz. 431, 440, ¶¶ 44-45, 55 P.3d 774, 783 (2002).[5]

## C.

¶18      The State Bar eventually charged Peasley with five counts of misconduct. The hearing officer found the bar had proven by clear and convincing evidence two counts of misconduct, one count for the 1993 joint trial and one for the 1997 Minnitt retrial. He found that Peasley intentionally violated Arizona Rule of the Supreme Court 42, Ethical Rule

---

[4]    Peasley was not the prosecutor for the third trial.

[5]    The *Minnitt* opinion was published after the hearing officer made his decision in Peasley's disciplinary case but before the Commission reviewed the hearing officer's decision. The Commission took judicial notice of the *Minnitt* decision and noted that it was consistent with the hearing officer's determination that Peasley acted intentionally.

("E.R.") 3.3(a)(4)[6] (candor toward the tribunal), E.R. 4.1(a) (false statement of material fact or law), E.R. 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and E.R. 8.4(d) (conduct prejudicial to the administration of justice).[7] The hearing officer referred to the *American Bar Association Standards for Imposing Lawyer Sanctions* ("*Standards*") (1992) to determine the appropriate sanction. *See, e.g., In re Shannon*, 179 Ariz. 52, 68, 876 P.2d 548, 564 (1994) (stating that "[w]e look to the American Bar Association's *Standards for Imposing Lawyer Sanctions* . . . for guidance in determining the appropriate sanction to impose" (citing *In re Tarletz*, 163 Ariz. 548, 554, 789 P.2d 1049, 1055 (1990))).

¶19     Under the *Standards*, consideration is given to the following factors: 1) the duty violated; 2) the lawyer's mental state; 3) the actual or potential injury caused by the misconduct; and 4) the existence of aggravating and mitigating factors. *Standard* 3.0.

---

[6]     Ethical Rule 3.3(a)(4) was renumbered and is now found at Ethical Rule 3.3(a)(3).

[7]     The Arizona Rules of Professional Conduct were amended on December 1, 2003. Peasley was disciplined under the Ethical Rules in effect before the amendment. We note that the Ethical Rules relating to both infractions remained substantially unchanged.

¶20     The hearing officer found that Peasley violated his duty as a prosecutor to the public and the court, and his responsibilities as a professional.  He further concluded that "Respondent was either oblivious to his obligations or intentionally disregarded them.  Respondent acted intentionally."  The hearing officer also found that Peasley's conduct caused potential injury, in that the death penalty was sought against both Minnitt and McCrimmon.

¶21     The hearing officer next considered whether any aggravating and mitigating factors existed.  *Standard* 3.0(d); *In re Augenstein*, 178 Ariz. 133, 136, 871 P.2d 254, 257 (1994).  He found only one aggravating factor:  substantial experience in the practice of law.  *See Standard* 9.22(i).  He found the following mitigating factors:  absence of a prior disciplinary record, *see Standard* 9.32(a); cooperative attitude toward disciplinary proceedings, *see Standard* 9.32(e); good character or reputation, *see Standard* 9.32(g); physical or mental disability or impairment (only as to the 1997 Minnitt retrial), *see Standard* 9.32(h); delay in disciplinary proceedings, *see Standard* 9.32(j); and interim rehabilitation.[8]  The hearing officer then conducted a proportionality analysis.  Although

---

[8]     The *Standards* were amended and renumbered in 1992 and interim rehabilitation, which used to be *Standard* 9.32(j), was removed as a mitigating factor.  Nevertheless, the hearing officer relied on this factor in mitigation.

acknowledging that the presumptive sanction for the type of misconduct Peasley committed is disbarment, *see Standard* 6.11,[9] the hearing officer found that the mitigating factors supported a recommendation that Peasley be suspended for sixty days. He also recommended that Peasley be placed on probation for one year and pay costs.

**D.**

¶22 On review, the Disciplinary Commission adopted the hearing officer's findings of fact and conclusions of law but viewed the aggravating and mitigating factors differently.[10] It agreed that substantial experience in the practice of law was an aggravating factor, *see Standard* 9.22(i), but noted this factor was "particularly aggravating given that Respondent is a seasoned prosecutor with over 25 years of experience." The Commission also found two additional aggravating factors: dishonest or selfish motive, *see Standard* 9.22(b); and multiple offenses, *see Standard* 9.22(d). It agreed with the following

---

[9] *Standard* 6.11 provides as follows:

> Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

[10] The Disciplinary Commission reviews questions of law de novo and defers to the hearing officer's findings of fact unless they are clearly erroneous. Ariz. R. Sup. Ct. 58(b).

three mitigating factors found by the hearing officer:  absence of a prior disciplinary record, *see Standard* 9.32(a); full and free disclosure to disciplinary board or cooperative attitude toward proceeding, *see Standard* 9.32(e); and good character and reputation, *see Standard* 9.32(g).  The Commission disagreed with the finding of physical or mental disability or impairment, *see Standard* 9.32(h); delay in disciplinary proceedings, *see Standard* 9.32(j); and interim rehabilitation.[11]  After conducting a proportionality analysis, the Commission recommended disbarment.

## II.

¶23      Our task in reviewing a lawyer disciplinary proceeding is to "examine the facts to determine if the evidence supports the factual findings made by the hearing officer and the Commission, as well as to decide on the appropriate sanction, if any."  *In re Walker*, 200 Ariz. 155, 160, ¶ 20, 24 P.3d 602, 607 (2001).  In conducting this review, "we give 'deference and serious consideration' to the recommendations of the hearing officer and the Commission."  *Id*. (citing *In re Curtis,* 184 Ariz. 256, 261, 908 P.2d 472, 477 (1995)).  However, "the responsibility to decide upon the appropriate sanction in a disciplinary proceeding is ultimately ours."  *Id*.  We also look to the *Standards* for guidance in deciding the proper

---

[11]     Former *Standard* 9.32(j).

disciplinary measures. *In re Scholl*, 200 Ariz. 222, 224, ¶ 9, 25 P.3d 710, 712 (2001).

¶24 Although Peasley raised numerous issues in his original petition for review, his contentions can be distilled to two: 1) whether Peasley was denied due process, and 2) whether the Commission's recommendation that Peasley be disbarred is supported by the record. We turn first to Peasley's contention that he was denied due process.

### A.

¶25 Peasley argues that the hearing officer violated his due process rights when he "adopted" the findings made by Judge Nichols and referred to Judge Nichols' testimony from an incomplete deposition. Specifically, he asserts that 1) Judge Nichols' findings were tainted by the influence of an *ex parte* meeting with an FBI agent; 2) the hearing officer denied Peasley's request to complete Judge Nichols' deposition or to call him at the hearing; and 3) the hearing officer stated that he would not rely on Judge Nichols' findings but then relied on them. As a consequence, Peasley contends that the hearing officer's finding that he intentionally presented false testimony was clearly erroneous. For those reasons, he requests a new hearing.

¶26 "[P]rocedural due process in attorney disciplinary proceedings include[s] fair notice of the charges made and an

- 14 -

opportunity for the accused to provide an explanation and present a defense." *Walker*, 200 Ariz. at 158, ¶ 13, 24 P.3d at 605 (citing *In re Brady*, 186 Ariz. 370, 373, 923 P.2d 836, 839 (1996)). After reviewing the record, we conclude that Peasley has not established that he was denied due process in these proceedings.

¶27 During the preparation for the hearing before the hearing officer, Peasley noticed Judge Nichols as a witness. He wanted Judge Nichols' testimony because Judge Nichols had found that Peasley's misconduct was not committed "with the intent to further an improper purpose." Peasley consequently deposed Judge Nichols but was unable to finish because of Judge Nichols' schedule. At the disciplinary hearing, Peasley attempted to call Judge Nichols as a witness or, in the alternative, complete his deposition. Bar counsel objected, and the hearing officer refused to permit Judge Nichols to appear or to permit Peasley to finish the deposition of Judge Nichols. The hearing officer, however, admitted portions of Judge Nichols' deposition but stated that he would not rely on the judge's opinion in making his decision. Nevertheless, the hearing officer quoted portions of Judge Nichols' findings in his report.

¶28 After the hearing officer issued his report, Peasley discovered that Judge Nichols had met with an FBI agent before

the hearing on Minnitt's motion to dismiss.[12] The agent's report indicated that the agent expressed his opinion to Judge Nichols that Peasley had intentionally presented false testimony.[13] Because of these circumstances, Peasley argues that the hearing officer's reliance on Judge Nichols' findings taints the whole proceeding. We disagree for several reasons.

¶29 First, the hearing officer said that he would not rely on Judge Nichols' findings but that he would reach his own conclusions. No evidence suggests that the hearing officer did not reach his own conclusions. For example, Judge Nichols found that Peasley's misconduct was not committed "with the intent to further an improper purpose." In contrast, the hearing officer specifically found that Peasley acted intentionally. This finding contradicts Peasley's contention that Judge Nichols' findings influenced the hearing officer's decision.

¶30 Second, the hearing officer's reference to Judge Nichols' findings can be fairly understood to relate solely to what happened in the trial court, rather than as a basis for his findings. The hearing officer gave a very detailed description

---

[12] Peasley received the FBI reports from the State Bar four months after he deposed Judge Nichols. But Peasley contends that he did not "revisit" those reports until after the hearing officer issued his decision.

[13] No explanation is given why Judge Nichols did not disclose this contact either before the hearing on the motion to dismiss or during his deposition in this proceeding.

- 16 -

of all the proceedings, including those that occurred before Judge Nichols. That the hearing officer quoted some of Judge Nichols' findings does not establish that he relied on those findings in making his recommendation.[14]

¶31 Third, and most importantly, even if the hearing officer relied on Judge Nichols' findings, no due process violation occurred because the record contains other evidence that supports the finding that Peasley acted intentionally. Specifically, the misconduct in both the 1993 joint trial and the 1997 Minnitt retrial was identical. In addition, the Soto-Fong trial revealed that Peasley knew Godoy considered McCrimmon and Minnitt to be suspects in the El Grande murders before he had interviewed Woods. Further, after the misconduct had been discovered in 1997, a grand jury was convened to investigate

---

[14] A judge's findings in the underlying criminal case do not necessarily determine whether or not an ethical violation occurred. *Cf. In re Wolfram*, 174 Ariz. 49, 53, 847 P.2d 94, 98 (1993) (holding that a trial court's finding of ineffective assistance of counsel in a Rule 32 proceeding does not "necessarily equate" to a finding of "a violation of our ethical rules"). In addition, we also note that "[o]nly in the rarest of circumstances should a judge be called upon to give evidence as to matters upon which he has acted in a judicial capacity, and these occasions, we think, should be limited to instances in which there is no other reasonably available way to prove the facts sought to be established." *State ex rel. Carroll v. Junker*, 482 P.2d 775, 781 (Wash. 1971); *see also Phillips v. Clancy*, 152 Ariz. 415, 420-21, 733 P.2d 300, 305-06 (App. 1986) (holding that public policy militates against a judge testifying as an expert witness for one of the parties). Because there were other reasonably available ways to establish Peasley's state of mind, calling Judge Nichols as a witness was unnecessary.

Peasley and Godoy. Peasley admitted to the grand jury that Detective Godoy's testimony was in fact false. Consequently, the presentation of the false testimony in the 1993 Minnitt and McCrimmon joint trial and the 1997 Minnitt retrial could only have been intentional. Thus, the hearing officer's finding that Peasley acted intentionally is supported by evidence independent of any findings by Judge Nichols. Accordingly, we hold that Peasley was not denied due process in this disciplinary hearing.

**B.**

¶32     As a result, we conclude that the hearing officer's factual findings are not clearly erroneous. The record clearly supports the finding that Peasley intentionally violated E.R. 3.3(a)(3) (candor toward the tribunal), E.R. 4.1(a) (false statement of material fact or law), E.R. 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and E.R. 8.4(d) (conduct prejudicial to the administration of justice). Because the record clearly and convincingly supports the finding that Peasley violated the ethical rules, we now must determine the appropriate sanction.

**III.**

¶33     As stated above, we apply the *Standards* when imposing attorney discipline. *Shannon*, 179 Ariz. at 68, 876 P.2d at 564. Like the hearing officer and the Commission, we consider the following factors:  1) the duty violated; 2) the lawyer's mental

state; 3) the actual or potential injury caused by the misconduct; and 4) the existence of aggravating and mitigating factors. *Standard* 3.0. In addition, we consider other similar cases in determining whether a specific sanction is proportional. *In re Horwitz*, 180 Ariz. 20, 28, 881 P.2d 352, 360 (1994). We address each of these considerations in turn.

**A.**

¶34 With respect to the first factor, Peasley violated his duty as a prosecutor to seek justice. "The prosecutor's interest in a criminal prosecution 'is not that it shall win a case, but that justice shall be done.'" *Pool v. Superior Court*, 139 Ariz. 98, 103, 677 P.2d 261, 266 (1984) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). In addition, courts generally recognize that the ethical rules impose high ethical standards on prosecutors.

> Recognizing a Government lawyer's role as a shepherd of justice, we must not forget that the authority of the Government lawyer does not arise from any *right* of the Government, but from *power* entrusted to the Government. When a Government lawyer, with enormous resources at his or her disposal, abuses this power and ignores ethical standards, he or she not only undermines the public trust, but inflicts damage beyond calculation to our system of justice. This alone compels the responsible and ethical exercise of this power.

*In re Doe*, 801 F. Supp. 478, 480 (D.N.M. 1992). By presenting false testimony in the prosecution of two defendants charged

with capital murder, Peasley violated one of the most important duties of a lawyer.

¶35     As to the second factor, the record clearly supports the finding that Peasley intentionally presented false testimony over the course of two trials.  The record also supports the finding that the third factor, actual or potential harm, occurred here.  Peasley sought and obtained the convictions and the death penalty against two capital murder defendants using false testimony to establish a crucial fact.  Such harm is particularly egregious.  *See In re Wolfram*, 174 Ariz. 49, 57, 847 P.2d 94, 103 (1993).  We cannot conceive of a more serious injury, not just to the defendants but to the criminal justice system, than a prosecutor's presentation of false testimony in a capital murder case.

¶36     The presumptive discipline for Peasley's intentional misconduct is disbarment.  *Standard* 6.11.  Thus, we must determine whether the aggravating factors, weighed against the mitigating factors, justify disbarment.  We first address the aggravating factors.  These factors need only be supported by reasonable evidence.  *In re Varbel*, 182 Ariz. 451, 455 n.7, 897 P.2d 1337, 1341 n.7 (1995).

**B.**

**1.**

¶37     Both the hearing officer and the Commission found that

- 20 -

substantial experience was an aggravating factor. The hearing officer did not give this factor any weight because he believed that it was offset by the corresponding mitigating factor of an unblemished disciplinary record. Prior decisions of this court support such an offset. *See, e.g.*, *Shannon*, 179 Ariz. at 68, 876 P.2d at 564. But as we suggested in *In re Arrick*, 180 Ariz. 136, 143, 882 P.2d 943, 950 (1994), the aggravating factor of substantial experience in the practice of law deserves closer examination and should not simply be "offset" by a supposedly unblemished record. *See also Shannon*, 179 Ariz. at 82, 876 P.2d at 578 (Zlaket, J., dissenting) (arguing that "using the mitigating effect of . . . discipline-free years to 'offset' the 'substantial practice' aggravating factor . . . effectively accords equal weight to both").

¶38      One commentator suggests that "[t]he justifications for treating substantial experience in the practice of law as an aggravating factor are weak in many cases." Leslie C. Levin, *The Emperor's Clothes and Other Tales About the Standards for Imposing Lawyer Discipline Sanctions*, 48 Am. U. L. Rev. 1, 50 (1998). Further, "[t]he bar admission standards in every state require applicants to demonstrate knowledge of professional responsibility rules and admitted lawyers are bound to abide by the rules regardless of their level of experience." *Id*. Thus, merely because a lawyer has substantial experience in the

practice of law should not mean that this aggravating factor automatically applies.

¶39      However, because "[t]here are, obviously, problems that more experienced lawyers may be better able to avoid than less experienced lawyers," there could "be cases in which the lawyer's substantial experience should be considered relevant to the sanction imposed." *Id*. at 52.  We conclude that when there is a nexus between a lawyer's experience and the misconduct, substantial experience should be considered a relevant aggravating factor.

¶40      Peasley maintains that substantial experience should not be considered an aggravating factor in his case because dishonesty is not the type of misconduct that becomes less likely with years of experience.  *See In re Savoy*, 181 Ariz. 368, 371, 891 P.2d 236, 239 (1995) (substantial experience "applies only when the misconduct would be less likely to occur the more experienced a lawyer becomes; but every lawyer is expected to be truthful, regardless of the length of time he has practiced").  Obviously, even the most inexperienced lawyer knows that he or she should not elicit false testimony. Nevertheless, when a lawyer's substantial experience places that lawyer in a position that would be unavailable to a less experienced lawyer, and that lawyer's experience also affords, or should afford, a greater appreciation of the advantages of

- 22 -

eliciting false testimony, substantial experience may be considered a relevant aggravating factor.

¶41    Peasley's substantial experience as a prosecutor placed him in a different position than a prosecutor with less experience.  First, because of his lengthy experience, Peasley had the ability to, and did, try the most serious of cases, capital murder cases.  Second, as the issuing attorney in the El Grande case, Peasley had the authority to, and did, assume responsibility for prosecuting the case himself.   More importantly, because of his substantial experience, particularly in prosecuting homicide cases, Peasley understood far better than would an inexperienced prosecutor how a jury would likely react to a suggestion that Detective Godoy "fed" information about Minnitt and McCrimmon to Woods.  Peasley would not have been prosecuting the El Grande murders but for his experience, and because of that experience, he recognized the significance of Godoy's testimony with respect to Woods' credibility.  We therefore conclude that Peasley's substantial experience does carry weight as an aggravating factor.

## 2.

¶42    The Commission also found the additional aggravating factor of dishonest or selfish motive, which Peasley contests. We have held that dishonest or selfish motive "speaks in terms of 'motive,' not conduct."  *Shannon*, 179 Ariz. at 69, 876 P.2d

at 565; *see also In re Attorney D.*, 57 P.3d 395, 400 (Colo. 2002) ("'[T]he absence of a dishonest or selfish motive,' . . . refers to the lawyer's motive for his conduct, without regard to any awareness on his part whether that conduct is specifically proscribed as unethical. While not necessarily irrelevant, a respondent's awareness that his conduct will violate an ethical proscription is not itself material."). Simply because an attorney's conduct is intentional or dishonest does not by itself establish a dishonest or selfish motive. *See In re Alcorn*, 202 Ariz. 62, 74, ¶ 42, 41 P.3d 600, 612 (2002) (respondent violated his ethical duty of candor toward the tribunal, but selfish motive was not an aggravating factor).

¶43     In the past, we have held that dishonest or selfish motive is an aggravating factor when an attorney received some financial gain or made misrepresentations to cover his or her negligence. These previous holdings of dishonest or selfish motive involved private attorneys, not public sector lawyers. *See, e.g.*, *Arrick*, 180 Ariz. at 143, 882 P.2d at 950 (holding that lawyer who made deliberate misrepresentations to his client to conceal his negligence and improperly retained a fee from that client had a dishonest or selfish motive); *Shannon*, 179 Ariz. at 69, 876 P.2d at 565 (finding lawyer who represented clients with conflicting interests did so for "selfish reasons"). We have never addressed a situation involving a

prosecutor who was alleged to have had a dishonest or selfish motive.

¶44     Nevertheless, we believe there are instances in which the misconduct of a prosecutor can be prompted by a dishonest or selfish motive.  Obtaining a conviction at any cost is one of them.  Peasley intentionally and repeatedly presented false testimony in an effort to bolster Woods' credibility solely for the purpose of obtaining convictions and subsequent death penalties for both Minnitt and McCrimmon.  In our view, such circumstances demonstrate a dishonest motive.  *Cf. People v. Pautler*, 35 P.3d 571, 585-86 (Colo. 2001) (finding that prosecutor who misrepresented himself to a suspect as a public defender was motivated in part by gaining an advantage in subsequent legal proceedings, which supported the existence of the aggravating factor of dishonest or selfish motive).  We therefore agree with the Commission that the aggravating factor of dishonest motive is present in this case.

**3.**

¶45     Peasley contests the Commission's finding of multiple offenses as an aggravating factor.  This court has applied the aggravating factor of multiple offenses to a lawyer's misconduct that involved multiple clients or multiple matters.  For example, we found multiple offenses when a lawyer violated duties owed to two clients, a former client, the court, and

opposing parties in a one-year period. *See In re Moak*, 205 Ariz. 351, 356, ¶ 30, 71 P.3d 343, 348 (2003). We also found multiple offenses when a lawyer brought several frivolous claims against multiple defendants on behalf of one client. *In re Levine*, 174 Ariz. 146, 171, 847 P.2d 1093, 1118 (1993). But we do not think this aggravating factor is limited to such situations. *Cf*. *In re Rome*, 856 So. 2d 1167, 1169-71 (La. 2003) (upholding finding of multiple offenses when assistant district attorney kept fine payments for himself on six to eight occasions).

¶46     Here, Peasley presented misleading and false testimony in two separate trials against two defendants. In each trial, he referred to Godoy's false testimony in his opening statements, elicited the false testimony on direct examination of Godoy, and exploited that false testimony in his closing arguments. Furthermore, his conduct was more egregious in the second trial than in the first — his questions were more specific and pointed in eliciting the false testimony. We therefore agree with the Commission and conclude that Peasley committed multiple offenses, which we consider to be a very serious aggravating factor.

**4.**

¶47     Peasley claims that the Commission erred in finding, as a de facto aggravating factor, that he failed to demonstrate

that recurrence was unlikely. The Commission found that Peasley's statement — that a "sick system" made Detective Godoy testify the way he did — suggested "the potential for future misconduct by Respondent, which places the public and criminal justice system at substantial risk." The Commission went on to state, "Given the seriousness of the misconduct and the significant injury it caused to the defendants and to the legal system, the Commission is convinced that the public and the criminal justice system will not be protected by anything less than disbarment."

¶48  We do not read the Commission as having treated the possibility of recurrence as an aggravating factor, but instead it simply considered that possibility in determining the appropriate sanction. We believe that such consideration was appropriate. "This court has long held that 'the objective of disciplinary proceedings is to protect the public, the profession and the administration of justice and not to punish the offender.'" *Alcorn,* 202 Ariz. at 74, ¶ 41, 41 P.3d at 612 (citing *In re Kastensmith,* 101 Ariz. 291, 294, 419 P.2d 75, 78 (1966); *see also Scholl*, 200 Ariz. at 227, ¶ 29, 25 P.3d at 715 ("The purpose of professional discipline is twofold: (1) to protect the public, the legal profession, and the justice system, and (2) to deter others from engaging in misconduct.").

## C.

¶49     We next examine the existence of mitigating factors. As discussed above, the hearing officer and the Commission reached different findings with respect to several of the mitigating factors.  Because our review is de novo, *see Moak*, 205 Ariz. at 352, ¶ 5, 71 P.3d at 344, we examine these factors in detail.

## 1.

¶50     Both the hearing officer and the Commission found Peasley's unblemished disciplinary record to be a mitigating factor.  This court has on occasion given great weight to an unblemished disciplinary record in determining the proper sanction for lawyer misconduct.  *In re Murphy*, 188 Ariz. 375, 380, 936 P.2d 1269, 1274 (1997) ("[W]e are greatly influenced by the fact that in 26 years of practice, respondent has never before received a disciplinary complaint."); *Levine*, 174 Ariz. at 172, 847 P.2d at 1119 ("We give great weight, in particular, to respondent's previous unblemished disciplinary record as well as his professional contributions and accomplishments during his 30 years of practice.").

¶51     The Commission did not give this factor much weight and the State Bar encourages us to do the same.  We agree that Peasley's unblemished disciplinary record should not be given great weight here.  First, "the absence of a disciplinary record

is not by itself proof of good conduct." Levin, *supra*, at 53-54. Second, although Peasley had not previously been formally disciplined by the State Bar, at least two reported decisions discuss Peasley's misconduct in the prosecution of those cases.[15]

**¶52** This court commented on allegations of prosecutorial misconduct by Peasley in *State v. Rodriguez*, 192 Ariz. 58, 64, ¶¶ 31-33, 961 P.2d 1006, 1012 (1998) (Peasley violated the discovery rules, failing to ensure that the defendant received a fair trial), and *State v. Trostle*, 191 Ariz. 4, 16, 951 P.2d 869, 881 (1997) (Peasley made inflammatory remarks about the defendant and made an impermissible comment on the defendant's failure to testify).[16] We acknowledge that these cases did not lead to Peasley being formally disciplined nor did Peasley's misconduct cause the convictions in those cases to be reversed.[17]

---

[15] We do not rely on these decisions as aggravation, but we do consider them in deciding the weight to be given the mitigating factor of unblemished disciplinary record. *See Horwitz*, 180 Ariz. at 22 & n.3, 881 P.2d at 354 & n.3 (taking judicial notice of official court record in respondent's criminal trial); *In re Ronwin*, 139 Ariz. 576, 579-82, 680 P.2d 107, 110-13 (1983) (taking judicial notice of actions filed by bar candidate in federal court).

[16] These decisions do not specifically mention Peasley's name, but during his disciplinary hearing, Peasely conceded he was the prosecutor in those cases.

[17] In *Rodriguez*, the court commented on Peasley's misconduct, but remanded the case for a new trial on other grounds. 192 Ariz. at 64, ¶ 31, 961 P.2d at 1012. In *Trostle*, the court found the error to be harmless. 191 Ariz. at 16, 951 P.2d at 881 ("Any error was harmless beyond a reasonable doubt.").

Nevertheless, these cases demonstrate that his misconduct in this matter was not entirely out of character. For this reason, we decline to give the factor of unblemished disciplinary record much weight.

### 2.

¶53 Although the hearing officer found interim rehabilitation to be a mitigating factor, the Commission rejected this as a mitigating factor. Peasley argues that interim rehabilitation should be a mitigating factor because he had taken steps to reduce his workload and to prepare for trial more thoroughly. Interim rehabilitation is no longer a mitigating factor under the *Standards*. *See Standard* 9.32. But we may still consider this factor in mitigation because the purpose of attorney discipline is not to punish but rather to protect the public. *See Alcorn*, 202 Ariz. at 74, ¶ 41, 41 P.3d at 612. Nevertheless, the facts do not indicate that overwork caused Peasley's misconduct. Neither Peasley nor the hearing officer points to any causal connection between Peasley's workload and his intentional presentation of false evidence. Thus, a reduced workload and additional preparation would not have prevented the misconduct that occurred here. Accordingly, we do not give this factor any weight.

### 3.

¶54 The Commission also rejected the hearing officer's

- 30 -

finding of the mitigating factor of physical disability in the 1997 Minnitt retrial. Peasley argues that the Commission applied the wrong criteria in rejecting this factor. We agree. Referring to the "[four]-pronged criteria" of *Standard* 9.32(i),[18] the Commission rejected the mitigating factor of physical disability in part because it concluded that Peasley "failed to demonstrate a sustained period of rehabilitation, and that a recurrence of the misconduct is unlikely." This reliance on a failure to demonstrate a sustained period of rehabilitation and the unlikelihood of recurrence was error. Such factors are only relevant when a lawyer claims mental disability or chemical dependency as a mitigating factor. *See Standard* 9.32(i). Peasley did not claim mental disability or chemical dependency. Instead, he contended that he suffered from a physical and

---

[18] These criteria are the following:

1. there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

2. the chemical dependency or mental disability caused the misconduct;

3. the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

4. the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

*Standard* 9.32(i).

medical disability "stemming from stress, overwork and ill health." *See Standard* 9.32(h). Nonetheless, we conclude that the evidence does not support this mitigating factor.

¶55    Physical disability is a mitigating factor only if there is a direct causal connection between the physical disability and the misconduct. *Standard* 9.32(h) & cmt. The stronger the connection between the disability and the misconduct, the greater the weight it must be given.[19]

¶56    Nothing in the record supports the finding that Peasley's physical disabilities caused his misconduct in the 1997 Minnitt retrial. The hearing officer found that Peasley suffered from vision problems, pain on his left side, periodic vertigo, and had difficulty focusing and concentrating during the Minnitt retrial. Although the hearing officer found these conditions to be a mitigating factor, we do not. Peasley did not establish a causal relationship between his physical problems and his misconduct. Peasley's physical condition in

---

[19]    The commentary to *Standard* 9.32 states:

> Direct causation between the [physical] disability . . . and the offense must be established. If the offense is proven to be attributable solely to a disability . . . it should be given the greatest weight. If it is principally responsible for the offense, it should be given very great weight; and if it is a substantial contributing cause of the offense, it should be given great weight. In all other cases in which [it] is considered as mitigating, it should be given little weight.

1997 does not explain his intentional misconduct in the Minnitt retrial. Thus, we reject the mitigating factor of physical impairment.

**4.**

¶57 Peasley also claims that his public and private humiliation should be considered in mitigation. Public and private humiliation is not listed as a mitigating factor in the *Standards*, but we previously have found humiliation to be a mitigating factor in certain circumstances. *See Walker*, 200 Ariz. at 161, ¶ 25, 24 P.3d at 608. Peasley relies on *Walker* for the proposition that because he suffered months of personal and public humiliation as a result of these proceedings, we should find mitigation.

¶58 The kind of humiliation this court examined in *Walker* was simply not the kind of humiliation that results from having one's misconduct subject to disciplinary proceedings. To the contrary, the humiliation discussed in *Walker* resulted from actions that occurred before the inception of disciplinary charges, not as a result of the disciplinary charges themselves. Specifically, Walker, after sexually harassing a client, was arrested in his office and taken to jail in handcuffs; the charges against him were made public by the local press; he was prosecuted for prostitution and sexual indecency; he entered a diversion program to avoid prosecution; and he was the subject

of a malpractice suit. *Id.* We concluded that what happened to Walker was "sufficient deterrence to other attorneys." *Id.* Any humiliation that Peasley may have suffered was a result of these disciplinary proceedings, not because of other factors like those in *Walker*. Therefore, we decline to find the mitigating factor of public and personal humiliation in this case.

**5.**

¶59        Peasley contends that we should recognize the delay in disciplinary proceedings as a mitigating factor. *See Standard* 9.32(j). We agree significant delay occurred in this case.[20] It took almost two years for the State Bar to issue a probable cause order from the time the initial complaint was filed with the State Bar. The formal complaint was filed a year after the probable cause order was issued — although during that time the parties had engaged in negotiations. The hearing officer then issued his decision more than two years after the formal complaint was filed. Although not all of the delay was the

---

[20]      The initial complaint was filed by McCrimmon's lawyer in September 1997. The State Bar did not forward the complaint to Peasley until March 1998. A probable cause order was not filed until May 1999. The formal complaint was finally filed in May 2000. The hearings before the hearing officer were conducted from June 2001 through December 2001. The hearing officer issued his report on July 1, 2002.

State Bar's fault, that delay negatively impacted Peasley.[21] Therefore, we consider the delay in this case to be a mitigating factor.

**6.**

**¶60**      Finally, with respect to the other mitigating factors, we agree with the hearing officer and the Commission that the evidence supports the mitigating factors of full and free disclosure to the disciplinary board or cooperative attitude toward the proceeding, *see Standard* 9.32(e), and good character and reputation, *see Standard* 9.32(g).

**D.**

**¶61**      The last step in determining if a particular sanction is appropriate is to assess whether the discipline is proportional to the discipline imposed in similar cases. *Alcorn*, 202 Ariz. at 76, ¶ 49, 41 P.3d at 614; *see also In re Wines*, 135 Ariz. 203, 207, 660 P.2d 454, 458 (1983) (finding that while proportionality is appropriate, discipline is tailored to each individual case). We found no cases in Arizona or any other jurisdiction with a similar fact pattern. But in Arizona and other jurisdictions, disbarment or a lengthy suspension are proper only in the most serious of circumstances. For example, this court disbarred a lawyer for making false

---

[21]    We recognize that part of the delay after the formal complaint was filed was either due to the complexity of the case or the result of Peasley's own litigation tactics.

statements to clients about filing a lawsuit, preparing a false, backdated letter for the State Bar during its investigation, submitting a false affidavit to the bar, and lying under oath during the disciplinary proceedings. *In re Fresquez*, 162 Ariz. 328, 329-31, 335, 783 P.2d 774, 775-77, 781 (1989). We also ordered disbarment when a lawyer, among other things, failed to diligently and competently represent several clients in civil matters, made factual misrepresentations to the court, failed to communicate with his clients, and failed to cooperate with the State Bar's investigation. *In re Elowitz*, 177 Ariz. 240, 241, 243, 866 P.2d 1326, 1327, 1329 (1994). Finally, this court mandated a three-year suspension when a lawyer manufactured evidence, committed perjury, and suborned perjury during a State Bar investigation. *In re Fioramonti*, 176 Ariz. 182, 187-89, 859 P.2d 1315, 1320-22 (1993).[22]

¶62    The Supreme Judicial Court of Maine upheld disbarment as the appropriate sanction when a defense attorney allowed his client to testify falsely at his criminal trial. *Board of Overseers v. Dineen*, 481 A.2d 499, 501 (Me. 1984). The court declared that "[t]here is no more egregious violation of a

---

[22]    *Fioramonti* is distinguishable from the present case for two reasons. First, while Fioramonti's actions were egregious, no third party was harmed. 176 Ariz. at 188, 859 P.2d at 1321. Second, although disbarment was the presumptive sanction for Fioramonti's misconduct, he was suspended due to the existence of mitigating factors. *Id*. at 189, 859 P.2d at 1322.

lawyer's duty as an officer of the court, and no clearer ethical breach" than deliberately eliciting false testimony from his client. *Id*. at 504.

¶63     The above cases indicate that disbarment in this case would be proportional to the discipline imposed in other cases involving serious misconduct.

**IV.**

¶64     As mentioned previously, "[t]he purposes of professional discipline are to protect the public, the legal profession, and the justice system, and to deter others from engaging in misconduct." *Horwitz*, 180 Ariz. at 28-29, 881 P.2d at 360-61 (citing *In re Neville*, 147 Ariz. 106, 116, 708 P.2d 1297, 1307 (1985), and *In re Swartz*, 141 Ariz. 266, 277, 686 P.2d 1236, 1247 (1984)). In addition, this court "must also try to instill public confidence in the bar's integrity." *Id*. at 29, 881 P.2d at 361 (citing *In re Loftus*, 171 Ariz. 672, 675, 832 P.2d 689, 692 (1992)).

¶65     Peasley's intentional elicitation of false testimony against two defendants in a capital murder trial in 1993, re-presentation of the same false testimony in the 1997 retrial of one of the defendants, and exploitation of that false testimony in the closing argument in both trials, could not have been more harmful to the justice system.  The credibility of the criminal justice system relies heavily on the integrity of those who work

in the system.  Moreover, a prosecutor has the added duty to see that justice is done.[23]  A prosecutor who deliberately presents false testimony, especially in a capital case, has caused incalculable injury to the integrity of the legal profession and the justice system.  In such a circumstance, the public's interest in seeing that justice has been fairly administered has been violated in a most fundamental way.  Peasley's misconduct has severely undermined the public's trust and confidence in Arizona's criminal justice system.  Therefore, in this case, "[a]ny sanction less than disbarment would be an inappropriate statement of what the bar and this court should and would tolerate."  *Id.*

¶66    In weighing the aggravating and mitigating circumstances, we determine that Peasley's multiple offenses and dishonest motive are exceptionally serious aggravators in this matter.  As such, we conclude those factors outweigh the mitigating factors of significant delay, cooperative attitude toward the disciplinary proceeding, and good character and reputation.  Thus, disbarment is required.

---

[23]    *See* Ariz. R. Sup. Ct. 42, E.R. 3.8 cmt. ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.").

¶67 Finally, Peasley raises several objections to the State Bar's Disciplinary Clerk's verified statement of costs and expenses. The statement asks for a total of $29,201.91.

¶68 An assessment of costs and expenses is one of the permissible sanctions in bar disciplinary proceedings. Ariz. R. Sup. Ct. 52(a)(8).[24] Rule 52(a)(8), in effect at the time of Peasley's proceedings, stated in part, the following:

> Misconduct shall be grounds for one or more of the following sanctions:
>
> * * *
>
> Assessment of the costs and expenses of discipline proceedings, imposed by order of a hearing officer or the commission, and otherwise by judgment entered in this court upon a statement of costs and expenses filed with the disciplinary clerk. The state bar shall file with the disciplinary clerk a statement of costs and expenses on proven counts within seven (7) days after a hearing officer report is filed. Assessment, based upon the recommendation of the hearing officer, as affirmed or modified by the commission, including any costs and expenses of adjudication, shall be included in the order or judgment . . . .

**A.**

¶69 The procedural background of the requests for costs and expenses is as follows. The hearing officer issued his

---

[24] The rule was substantially revised and renumbered, effective December 1, 2003. *See* Ariz. R. Sup. Ct. 60(b).

report on July 1, 2002, which ordered Peasley to pay costs and expenses. Within a week, the bar submitted its statement of costs and expenses requesting a total of $16,686.44. The hearing officer never ruled on the bar's request.

¶70     In its order, the Commission reduced the costs and expenses by $7330.24, which reflected the bar's expenses in using a computer program in preparation for the disciplinary hearing. Nevertheless, the verified statement filed by the Disciplinary Clerk with this court on October 10, 2003, included the expenses of the computer program, as well as additional costs and expenses of court reporters, for a total assessment of $29,201.91.

**B.**

¶71     Pointing to Rule 52(a)(8), Peasley first argues that he should be assessed only those costs and expenses incurred with respect to the proven counts. He contends that expenses involving certain witnesses and experts should not be assessed as these individuals "had nothing to do" with the proven counts. He suggests "a rational approach would be to deem that the state bar, having proven two of its five counts, established [forty percent] of its case." The bar therefore should be limited to recovering forty percent of its costs and expenses. The State Bar counters that none of the requested costs and expenses pertain solely to the unproven counts. We agree with the bar.

The bulk of the bar's case involved the misconduct in the Minnitt and McCrimmon joint trial and the Minnitt retrial. We consequently decline to reduce the costs and expenses to forty percent.

¶72    Citing Rule 46(g)(9),[25] which allows an assessment for expenses "necessarily incurred by the state bar and the disciplinary clerk's office," Peasley next argues that the expenses incurred for a computer program used by counsel for the bar were not necessary. The program was used to scan more than 4800 pages of the El Grande murder trial transcripts into a software program, which permitted bar counsel to search the transcripts by word and phrase. It also allowed counsel to project selected portions of the transcripts on a large screen to assist the witnesses and the hearing officer during the hearing. The Commission declined to assess these expenses against Peasley. From our review of the record, it does not appear that the computer program was particularly necessary for bar counsel to present her case. Accordingly, we agree with the Commission and conclude that the expenses of the computer program should not be assessed against Peasley.

¶73    Peasley also objects to an assessment of expenses for two experts the bar consulted in preparing the case for hearing. Because these experts were neither called nor disclosed, Peasley

---

[25]    Current Rule 46(f)(12).

argues they were not "witnesses" as contemplated by Rule 46(g)(9) ("Expenses shall include, by way of illustration and not limitation, . . . charges of expert witnesses . . . ."). The bar argues that the expenses it incurred in consulting with the experts were "justified." We are not persuaded. One of the experts, an attorney, advised bar counsel in connection with preparing the complaint, and the other, a doctor, was consulted concerning Peasley's medical condition in 1997, which was raised by him as a mitigating factor with respect to the 1997 retrials. Neither expert was noticed as a witness nor were any reports of those experts disclosed to Peasley. Accordingly, we agree with Peasley that he should not be assessed the expenses of the bar's consultation with these two experts.

¶74 Peasley next argues that he should not be assessed $10,853.92 in expenses for court reporters and transcripts. These expenses were added when the Disciplinary Clerk filed the verified statement of costs and expenses on October 10, 2003. Peasley contends that because these costs were not included in the State Bar's verified statement of July 8, 2002, they were not timely requested. As quoted above, Rule 52(a)(8) requires the State Bar to file "a statement of costs and expenses on proven counts within seven (7) days after a hearing officer report is filed."

¶75        The bar argues that the total costs of court reporter services are not known until the case is transmitted to this court.  It is at that time the transcripts are prepared, and thus, such "costs can be computed."  But, the transcripts at issue here (with the exception of one) were filed and the accompanying invoices were submitted to the State Bar in 2000 and 2001.  Thus, the necessary information to include nearly all of the costs of the court reporter services was available before the hearing officer issued his report in July 2002.[26]

¶76        Nevertheless, we believe that these costs should be assessed against Peasley.  Rule 52(a)(8) provides that an assessment "be included in the order or judgment."  Such an assessment shall include "any costs and expenses of adjudication."  *Id*.  Although the rule declares that the assessment be "based upon the recommendation of the hearing officer," the Commission has the authority to modify the recommendation.  *Id*.  Because the rule permits modification of any assessment recommended by the hearing officer and also requires that any final order or judgment include the assessment (including the "costs and expenses of adjudication"), we conclude that the additional expenses of the court reporting

---

[26]    The only court reporter services that were not known at that time were the costs of such services for the proceedings before the Commission.  The invoice for that transcript was received by the disciplinary clerk on December 2, 2002.

services can be assessed against Peasley.

**¶77** As a final point, Peasley argues that "Rule 52(a)(8) contemplates that the assessment of costs and expenses be determined initially by the hearing officer," and because that did not occur in this case, the State Bar's request must be denied in its entirety. The bar responds that the rule permits the hearing officer *or* the Commission to assess costs and expenses. Indeed, Rule 52(a)(8) does provide for an "[a]ssessment of the costs and expenses of discipline proceedings, *imposed by order of a hearing officer or the commission, and otherwise by judgment entered in this court upon a statement of costs and expenses filed with the disciplinary clerk*." (Emphasis added.) Although the rule is not a model of clarity, it does contemplate an assessment of costs by the hearing officer, the Commission, or this court. Under Peasley's interpretation of the rule, the assessment of costs and expenses would be fixed at the conclusion of the hearings before the hearing officer.[27] If that were the case, no costs and expenses could ever be assessed for the costs of the proceedings before the Commission or this court. We do not think the rule intended

---

[27] As noted in footnote 20, the rule with respect to the assessment of costs and expenses has been amended. *See* Ariz. R. Sup. Ct. 60(b). The amended rule provides that such an assessment will occur upon the completion of the disciplinary proceedings, whether that occurs upon final order of the hearing officer, the Commission, or this court. *Id*. R. 60(b)(2)(A)-(C).

- 44 -

such a result.  Therefore, we reject Peasley's argument on this point.

## VI.

¶78    Based on the foregoing, we order that Peasley be disbarred and that he be assessed costs and expenses consistent with this opinion.

_____
Michael D. Ryan, Justice


CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice


_____
Rebecca White Berch, Justice


_____
Andrew D. Hurwitz, Justice