881 P.2d 352

**In the Matter of a Suspended Member of the State Bar of Arizona, Richard A. HORWITZ, Respondent.**

**No. SB–93–0056–D.**

Supreme Court of Arizona,
En Banc.

Oct. 11, 1994.

Debus and Kazan, Ltd. by Lawrence I. Kazan, Phoenix, for respondent.

State Bar of Arizona by Yigael M. Cohen, Phoenix, for Bar Counsel.

**OPINION**

FELDMAN, Chief Justice.

This bar disciplinary action began after Richard Alan Horwitz was convicted of two counts of negligent homicide. As a result of these convictions, this court placed Horwitz on interim suspension from the practice of law. Rule 52(c), Ariz.R.Sup.Ct. (hereinafter "Rule __"). This court's Disciplinary Commission ("Commission") recommended that Horwitz be disbarred, and he filed a timely notice of appeal. We have jurisdiction pursuant to Rules 46(a) and 53(e) and Ariz. Const. art. 6, § 5(3).

In bar disciplinary proceedings, this court is an independent trier of fact and law

as part of our supervisory role over the State Bar. *In re Wolfram,* 174 Ariz. 49, 52, 847 P.2d 94, 97 (1983).

# FACTS

At about 10:00 a.m. on July 26, 1990, Horwitz drove his car across the center line of a busy street and collided with an oncoming car, killing the car's occupants, two police officers. Blood and urine tests revealed the presence of cocaine and two prescription drugs in Horwitz' system. He was indicted and tried on two counts of second degree murder. After a hung jury and mistrial, Horwitz pleaded guilty to two counts of negligent homicide and was sentenced to two concurrent eight-year prison terms.

## A. Horwitz' prior drug and alcohol problems

Evidence from the trial and the later bar disciplinary proceedings showed that Horwitz was a chronic abuser of drugs and alcohol. In 1980 he was convicted in Florida of driving under the influence of alcohol. Horwitz admitted that he began using cocaine and other illegal drugs in 1985. In June 1987, following a family intervention session, he entered an alcohol abuse program. In 1989, however, police again arrested him for driving under the influence of alcohol and leaving the scene of an injury accident. Horwitz pleaded guilty to a simple DUI charge and received a ten-day jail sentence and two years' probation. Early in 1990, he underwent further treatment for alcohol and cocaine addiction. Nevertheless, on July 19, 1990, Horwitz summoned police to his home because he believed "gypsies" were present and would not leave. Police searched the empty home and left after calming Horwitz.

By the time of the accident, Horwitz' drug problems were destroying his marriage. He separated from his wife and stayed at a motel. Horwitz admits that during this period he was using cocaine roughly every other day. He was also taking about thirty Valium pills every two days, as well as Imipramine, an antidepressant.

## B. The automobile accident

About 4:00 p.m. on the day before the accident, Horwitz started taking cocaine and drinking beer. He used about a gram of cocaine, injecting some and snorting the rest during the evening. Horwitz says that he took the last of the cocaine about 1:00 a.m. He then slept until about 7:30 a.m. on July 26. He claims he took no more cocaine before the accident.

Horwitz was scheduled to appear at a court hearing at 10:00 a.m. on behalf of Dr. Risley, a chiropractor who had known Horwitz and his wife for some time. A few days before the hearing, both Horwitz and his wife separately suggested to Dr. Risley that he contact Horwitz just before the hearing to be sure Horwitz would be ready. Dr. Risley believed this was necessary because Horwitz was taking his divorce badly and having trouble sleeping.

When Horwitz failed to appear at his office by 9:00 a.m. on the day of the hearing, Dr. Risley called him at the motel and then went there to ensure that Horwitz would be ready. When Risley arrived, Horwitz was awake and almost fully dressed, but his eyes were bloodshot and had dark circles under them. He told Dr. Risley he was exhausted. The doctor testified that he felt sure, nevertheless, that Horwitz was not under the influence of alcohol or drugs and was fully competent to handle the scheduled hearing. Dr. Risley left Horwitz' room at about 9:25 a.m. with the understanding that Horwitz would soon follow.

After Dr. Risley left, Horwitz says he took a shower and went back to sleep. When he awoke he realized he was late for his 10:00 a.m. court appearance and rushed to the courthouse. Although the motel was on 19th Avenue in north Phoenix and the courthouse was on First Avenue, Horwitz detoured several blocks east to Seventh Street. When asked about this during the bar disciplinary proceedings, Horwitz could provide no cogent explanation for his circuitous route.

While driving south on Seventh Street, Horwitz decided to call the court to let them know he would be arriving late. After getting the telephone number from directory

assistance, he looked down at his phone to dial. During that brief instant, he did not notice that the road curved, and he failed to negotiate the curve. Before he could press the send button on his phone, his car crossed the center line and collided with an oncoming car. Horwitz' speed was estimated at between 50 and 60 m.p.h. in a 45 m.p.h. zone.

Paramedics at the scene saw fresh needle marks on Horwitz' arms, and he admitted to them that he was an intravenous cocaine user. After Horwitz arrived at the hospital, medical personnel gave police samples of his blood and urine. Tests showed that Horwitz had Imipramine,[1] Valium,[2] and cocaine in his system.

## C. Horwitz' conduct in his law practice

Despite Horwitz' extensive drug and alcohol abuse, the record shows no pattern of neglecting his clients or his practice. *Cf. In re Rivkind,* 164 Ariz. 154, 158, 791 P.2d 1037, 1041 (1990). On the contrary, many of his clients seemed satisfied with his professional services. A lawyer familiar with Horwitz' practice praised his professional competence. In addition, Horwitz demonstrated that his clients were not seriously damaged by the termination of his practice because his brother, an attorney, took over the cases of those clients who so desired.

## D. Conduct after the accident

Horwitz continued his substance abuse after the accident. On September 21, 1990, he went to an Elks Lodge and ordered a rum drink. The bartender, noticing that Horwitz was already intoxicated, refused to serve him. Horwitz then cursed, kicked walls, slammed doors, and spat at the bartender. Horwitz threw one of his crutches at a Lodge

official who asked him to leave. Police later arrested Horwitz for assault.

On November 25, 1990, Horwitz tried to fill a pain medication prescription at a grocery store. Because Horwitz seemed heavily intoxicated, the pharmacist called Horwitz' doctor to confirm the prescription. The doctor instructed the pharmacist not to fill the prescription. When the pharmacist complied with the doctor's order, Horwitz used offensive language and knocked merchandise from the shelves. Police asked Horwitz to leave, but he refused, knocked over more merchandise, pushed his fingers into an officer's chest, and continued to use vulgar language. Police eventually arrested him for trespassing. While in custody he appeared to be hallucinating.

## E. Horwitz' trial and plea agreement

■ As a result of the automobile accident, Horwitz was indicted on two counts of second degree murder and tried in early 1991. After close of evidence, the judge directed a verdict of acquittal on the second degree murder charge and instructed the jury on the lesser included charges of manslaughter and negligent homicide. The jury could not reach a verdict, however, and the judge declared a mistrial. Horwitz later pleaded guilty to two counts of negligent homicide. As part of the plea agreement, the state dismissed the charges from both the Elks Lodge and the grocery store incidents. On August 19, 1991, the trial judge sentenced Horwitz to two concurrent eight-year prison terms for each negligent homicide count. As a reason for imposing an aggravated sentence, the judge cited "the fact that cocaine was in his system." Reporter's Transcript ("R.T."), Aug. 19, 1991, at 35.[3]

1. This drug, imipramine hydrochloride, is prescribed for the relief of depression symptoms. PHYSICIANS' DESK REFERENCE 993 (1994). Although its sedative effect may impair an individual's ability to drive safely, according to Dr. Baselt, an expert clinical toxicologist who testified at a pretrial evidentiary hearing, its interactive effect with cocaine appears to be unknown. Imipramine may, however, potentiate the effects of other antidepressant drugs. *Id.*

2. Valium, generically known as diazepam, is a prescription drug used to manage anxiety and

tension. PHYSICIANS' DESK REFERENCE 1969 (1994). It has a calming effect, often inducing drowsiness. Frequent use may cause physical dependency and drug tolerance such that increasingly larger doses are required to obtain the same effect. According to Dr. Baselt, cocaine users sometimes take Valium to help them sleep or calm down after taking too much cocaine.

3. Although this transcript was not part of the appellate record, we take judicial notice of this official court record from Horwitz' criminal trial

### F. Horwitz' rehabilitation while incarcerated

While in jail awaiting trial, Horwitz began participating in substance abuse programs. The record reflects regular attendance and successful completion of several such courses during his imprisonment. In addition, he testified that, despite the availability of drugs and alcohol in prison, he has not used them and has never tested positive in prison. He also has worked in the prison's Psychology Department and has maintained above-average work reports. He says that he hopes to be released by August 1996. He is planning to attend Narcotics Anonymous sessions every day after his release and is exploring a residential transition program. He would especially like to practice law again.

### G. Bar disciplinary proceedings

After Horwitz pleaded guilty to the criminal charges, the Bar brought disciplinary proceedings against him, alleging that his conduct violated Rule 42, ER 8.4(b)[4] and Rule 51(a).[5] A hearing committee ("Committee") conducted a series of hearings and issued a report.[6] *See* Rules 48(e) and 57(a). The Bar presented no witnesses and relied only on the proof of conviction and various exhibits, such as police reports and transcripts of medical testimony from Horwitz' criminal trial.

Based on this evidence, the Committee was unable to conclude that Horwitz' use of cocaine or any other drugs directly caused the accident. Rather, the Committee stated, "the cause of the accident must be found to be inattentiveness." Nevertheless, the Com-

mittee concluded that Horwitz' conduct violated ER 8.4(b) because his convictions adversely reflected on his fitness as a lawyer. The Committee also found that the two felony convictions were grounds for discipline under Rule 51(a).

In the Committee's view, however, disbarment was not appropriate given the charges proven by the Bar and the mitigating factors present. Instead, the Committee recommended that Horwitz be suspended from the practice of law while incarcerated, but in no event for more than five years, and that he be placed on probation for two years after the suspension ends, subject to participation in therapy and drug and alcohol abstinence enforced by random drug tests.

The Commission unanimously adopted the Committee's findings but concluded that the Committee failed to adequately consider the aggravating factors. While noting that the mitigating factors outnumbered the aggravating factors, the Commission concluded that the aggravating factors outweighed them and recommended that Horwitz be disbarred.

### DISCUSSION

### A. Violations of the rules of professional conduct

■ With the underlying facts in mind, we now consider whether Horwitz' actions violated the Rules of Professional Conduct. The Committee found, and the Commission agreed, that Horwitz' conduct violated Rule 42, ER 8.4(b) and Rule 51(a). We agree.

---

(Maricopa County case No. CR 90–90557). Rule 201, Ariz.R.Evid.; *see also Scottsdale Memorial Health Sys. v. Clark,* 157 Ariz. 461, 468, 759 P.2d 607, 614 (1988) (permissible to take judicial notice of record in previous case if party was joined in the action); *In re Ronwin,* 139 Ariz. 576, 580 n. 4, 680 P.2d 107, 111 n. 4 (1983) (court may take judicial notice that bar applicant filed certain actions in federal court).

4. ER 8.4 provides, in relevant part:

It is a professional misconduct for a lawyer to:

\* \* \* \* \* \*

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. . . .

5. Rule 51 provides in relevant part:

Grounds for discipline of members and non-members shall be misconduct occurring as follows:

(a) Conviction of a misdemeanor involving a serious crime or of any felony.

6. The Committee carefully noted that throughout the proceedings bar counsel never alleged that Horwitz' illegal use of controlled substances, his addiction to alcohol, his prior DUI convictions, or his subsequent arrests were separate ethical violations. Rather, the Bar relied on these factors as aggravating circumstances to be considered only in deciding what sanction to impose for the criminal conviction.

Under ER 8.4(b), a lawyer who commits a criminal act that reflects adversely on his fitness as a lawyer commits professional misconduct. As the Committee stated, Horwitz' criminal negligence, which caused the death of two innocent people, and substantial illegal drug use certainly reflects "adversely on a lawyer's fitness to practice law." Committee Report No. 90–1945, Feb. 19, 1993, at 13. *See Rivkind*, 164 Ariz. at 157, 791 P.2d at 1040 (conviction for possession of cocaine places in doubt lawyer's ability to respect and uphold the law). In addition, his actions both before and after the accident constituted a pattern of criminal conduct that reflects poorly on his fitness for the legal profession. Ten years of alcohol and drug abuse and illegal drug use, several DUI convictions, the Elks Lodge assault, and the grocery store trespassing incident combine to raise significant doubt about Horwitz' ability to maintain the personal integrity expected of a lawyer. To protect the integrity of the legal profession and foster public confidence in it, lawyers must not show habitual disrespect for the law. *See* ER 8.4(b) commentary; *In re Fioramonti*, 176 Ariz. 182, 187, 859 P.2d 1315, 1320 (1993) (public expects a lawyer to be honest and abide by the law, citing commentary, American Bar Association STANDARDS FOR IMPOSING LAWYER SANCTIONS, Standard 5.0).

With due respect to Thomas More, who we fear is an exception to the rule, we do not equate the practice of law with the path leading to sainthood. An occasional violation of the law of a type not involving moral turpitude does not necessarily reflect on a lawyer's professional fitness. On the other hand, the public has a right to expect that lawyers will, in general, live as law-abiding citizens. In our view, a ten-year pattern of law violations like that shown by Horwitz indicates that he is unfit for the practice of law. *See* ER 8.4, commentary ("A pattern of repeated offenses ... can indicate indifference to legal obligation."). We conclude, therefore, that Horwitz violated ER 8.4 and is subject to discipline.

Rule 51(a), which provides that "[a] lawyer shall be disciplined as the facts warrant upon conviction of ... any felony," also subjects Horwitz to disciplinary action for his felony conviction. Although there is no dispute that disciplinary action is appropriate, there is a dispute about what the facts warrant. We do not determine the propriety of a particular sanction by the label of the crime for which a lawyer was convicted. Thus, the facts supporting a finding of negligent homicide, and not the statutory elements of the crime, may or may not warrant disbarment. *See* A.R.S. §§ 13–1102 (elements of negligent homicide) and 13–105(6)(d) (defining criminal negligence). Arguing that the facts warrant a lesser sanction, Horwitz takes issue with the Commission's recommendation of disbarment and asks this court to follow the Committee's recommendation of a five-year suspension.

If disbarred, Horwitz cannot practice again until he applies for and is granted readmission, a process unavailable to him for five years from the date of disbarment. He must then pass the bar examination and make a showing of good moral character. *See* Rules 71 and 72. If suspended for five years, he likewise cannot practice law again until five years have passed, he applies for readmission, makes a showing of good moral character, and passes the bar examination. *See* Rules 71 and 72. One might ask, therefore, what difference it makes whether Horwitz is disbarred or suspended for five years. When presented with this question at oral arguments, Horwitz' counsel was commendably frank. To Horwitz, he said, it makes a great deal of difference because there is much more opprobrium attached to disbarment. We agree and believe also that disbarment makes one type of statement to the public and suspension another. This is especially true if a lawyer has committed a felony within the context of chronic drug abuse. We acknowledge, therefore, that disbarment is a more severe sanction even if the practical effect is not.

Although the Commission fully accepted the Committee's findings of fact and conclusions of law, it attempted to fashion a proper sanction from the American Bar Association STANDARDS FOR IMPOSING LAWYER SANCTIONS (1991, with 1992 amendments) (hereinafter "STANDARDS"). Had the Committee found that cocaine use caused the accident, there is

little question that disbarment would be appropriate under these guidelines.[7] Under a contrary finding, however, the STANDARDS offer little support for disbarment. In the absence of a direct nexus between the lawyer's conduct and actual or potential harm to his clients, this appeal raises a significant disciplinary issue.

## B. The ABA STANDARDS

In lawyer discipline cases, we often look to the STANDARDS for guidance. *Wolfram,* 174 Ariz. at 57, 847 P.2d at 102. Several standards are relevant to the present matter. Standards 5.11 and 5.12 discuss when disbarment and suspension are appropriate. They provide, in pertinent part:

> 5.11 *Disbarment* is generally appropriate when:
>
> (a) a lawyer engages in serious criminal conduct *a necessary element of which includes* intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the *sale, distribution or importation of controlled substances;* or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses. . . .
>
> 5.12 *Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements* listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

(Emphasis added.)

The Committee found that Standard 5.12, which calls for suspension rather than disbarment, applies to this case because none of Horwitz' conduct fits Standard 5.11. The Commission, however, concluded that disbarment was appropriate. Although the Committee was correct that none of Horwitz' conduct fits within Standard 5.11, both of these standards set forth only *general* recommendations. The appropriate sanction in any given case requires consideration of all relevant aggravating and mitigating factors. *Fioramonti,* 176 Ariz. at 188, 859 P.2d at 1321.

Standard 3.0 states:

> In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors:
>
> (a) the duty violated;
>
> (b) the lawyer's mental state; and
>
> (c) the actual or potential injury caused by the lawyer's misconduct; and
>
> (d) the existence of aggravating or mitigating factors.

The Committee concluded first that Horwitz violated his duty to the public by acting with criminal negligence. *See* A.R.S. § 13–1102 (criminal negligence is an element of negligent homicide). Second, considering Horwitz' mental state, the Committee found no evidence that he intended the accident but concluded that he knowingly exercised extremely poor judgment by driving in a debilitated mental and physical condition. Third, the harm he caused was extraordinarily tragic. Finally, under Standard 3.0 we examine the relevant aggravating and mitigating factors, particularly those set forth in Standard 9.0. Section 9.32 lists factors to be considered in mitigation. Those relevant to the present case are:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

*   *   *   *   *   *

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

*   *   *   *   *   *

(g) character or reputation;

*   *   *   *   *   *

---

**7.** A finding that cocaine was used just before the accident would also contradict Horwitz' claim of non-use that morning. Making false statements during the disciplinary process is an aggravating factor under Standard 9.22, to which this court would give great weight. In the absence of mitigating factors, a lawyer's false statements with the intent to deceive the court causing "a significant or potentially adverse effect on the legal proceeding" is grounds for disbarment. Standard 6.11. *See also In re Pappas,* 159 Ariz. 516, 527, 768 P.2d 1161, 1172 (1989) ("Failure to cooperate with disciplinary authorities is a significant aggravating factor.").

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

\* \* \* \* \* \*

(k) imposition of other penalties or sanctions;

(*l*) remorse.

Horwitz had no prior disciplinary record, he had no dishonest or selfish motive, he was experiencing personal and emotional problems at the time of the accident, he cooperated in the disciplinary process, he had a good reputation for character and competence, he is currently serving an eight-year prison sentence, he is attempting rehabilitation while in prison, and he shows genuine remorse.

Factor (i) of § 9.32 concerns recovery from chemical dependency and is absent from the Commission's discussion, apparently because it has only recently been adopted. We do not believe, however, that Horwitz' interim rehabilitation provides clear and convincing evidence that recurrence of the misconduct is unlikely. The present rehabilitative process is taking place while Horwitz is incarcerated, and he has a history of failed attempts at rehabilitation. We therefore do not find mitigating factor (i) to be present. It is one thing to "stay clean" in prison and another to remain that way once released. Any present judgment about rehabilitation is premature.

Standard 9.22 lists eleven aggravating factors (although others may also be considered). We agree with the Committee and Commission that two of the enumerated factors are present: "a pattern of misconduct" before and after the accident, Standard 9.22(c); and Horwitz' "illegal conduct, *including that involving the use of controlled substances,*" Standard 9.22(k) (emphasis added). The latter is determinative in the present case. For that reason, we turn to and set out the relevant facts in some detail.

## C. The role of cocaine in the accident

Given the procedural posture of this case, any connection between drug use and the accident is relevant only to the issue of aggravation. Horwitz correctly argues that the Committee and Commission found the cause of the accident to be inattentiveness rather than intoxication. Because this court independently tries both fact and law, *Wolfram,* 174 Ariz. at 52, 847 P.2d at 97, we have closely examined the record to determine whether the facts support the Commission's conclusion. There is some evidence that Horwitz was not under the influence of cocaine at the time of the accident. Horwitz testified that he last used cocaine at about one a.m., nine hours before the accident. Medical testimony indicated that usage this long before the accident would not have affected his driving at the time of the crash. In addition, Dr. Risley, who saw Horwitz about thirty-five minutes before the accident testified, "I will take with me to the grave that Rick was competent, oriented, well he was not under the influence of any—either drug or alcohol or anything like that at the time." R.T. June 10, 1992, at 32.

On the other hand, at a pretrial evidentiary hearing, the state's clinical toxicologist opined that Horwitz probably took his last dose of cocaine within two hours, and perhaps within minutes, of the accident. His opinion was based on the levels of cocaine and a cocaine metabolite (benzolecognine) found in Horwitz' blood and urine samples, Horwitz' vital signs charted by the emergency room personnel immediately after the accident, Horwitz' drug-use history, photographs of needle track marks on Horwitz' arms, a statement made by an eyewitness to the accident describing Horwitz' driving as erratic and uncontrolled, Dr. Risley's statement that Horwitz did not appear to have been under the influence of a drug when he visited him the morning of the accident, and research by the expert and others about the

behavior of cocaine abusers and the toxicology of cocaine. According to Dr. Baselt, the levels of cocaine metabolite found in Horwitz' system at different times after the accident were consistent with very recent usage of cocaine.

Cocaine intoxication would explain much of Horwitz' behavior on the morning of the accident, such as why he was late despite Dr. Risley's wake-up visit (Horwitz may have braced himself with a dose to overcome post-use depression[8]), why he took a circuitous route to the court (his thoughts may have been racing ahead[9]), and why he crossed the center line and caused the accident.[10] Based on Dr. Baselt's profile of the typical cocaine abuser, this scenario fits one who depends on cocaine to start the day.

Although we find Dr. Baselt's direct testimony persuasive, on cross-examination he admitted that the levels of cocaine in Horwitz' system could also be explained by a higher dosage having been taken as much as four hours before the accident. Given his testimony that cocaine's effects generally last one to two hours, it is possible that Horwitz was not under the direct influence of cocaine when the accident occurred. Dr. Baselt also was unable to state that there was a reasonable scientific certainty the cocaine affected Horwitz' driving. Moreover, he acknowledged that there is no general consensus in the scientific community on exactly what level of cocaine, within the range detected in Horwitz' system, will necessarily impair a person's ability to drive.

■ Despite doubts brought out in cross-examination about cocaine's direct effect in causing the accident, we view the evidence of cocaine use far less benignly than did the Committee and Commission. In bar disci-plinary cases we give great deference to the findings of the Committee and Commission, both of which had an opportunity to hear the witnesses and judge their credibility and accuracy. *Wolfram,* 174 Ariz. at 52, 847 P.2d at 97. Moreover, as a general matter, factual findings of misconduct in bar disciplinary cases must be established by clear and convincing evidence. Rule 54(c); *see also Wolfram,* 174 Ariz. at 52, 847 P.2d at 97. In the present case we note that the only portion of the criminal case record before us is the transcript of the state's toxicologist testifying at the suppression hearing. We do not know what evidence may have been offered by or available to Horwitz at trial, but we are aware that the trial judge, having heard much more evidence than is in this record, granted Horwitz' motion for a directed verdict on the murder charge. Thus, we accept the conclusions of the Committee and Commission that cocaine did not cause the accident.

However, even if the evidence fails to establish by clear and convincing proof that cocaine use proximately or directly caused the accident, we believe drug use is a very weighty aggravating factor. It is apparent that Horwitz' cocaine usage was neither irrelevant nor peripheral. There are many ways to prepare for a court appearance; Horwitz' procedure was unorthodox and, we pray, extraordinary. Horwitz admits that he prepared to argue his client's cause by staying up late the night before in his private shooting gallery mainlining cocaine, which surely affected the sleep he got that night.[11] When he awoke he was exhausted and running late for his court appearance. His client had to find him to ensure his timely arrival in court. Even so, he went back to sleep and awoke too late to get to court on time. His fatigue

---

8. According to Dr. Baselt, many cocaine users experience fatigue and the urge to sleep following an elevated level of alertness and activity stimulated by cocaine ingestion.

9. Dr. Baselt testified that cocaine "accelerates the thought processes to the point where the person may not be allowing enough time or allowing the proper type of judgment when it comes to operating a motor vehicle." R.T., May 1, 1991, at 35.

10. In Dr. Baselt's view, cocaine exaggerates self-confidence and increases risky behavior. Taking one's eye off the road to dial a telephone number is a form of risk-taking behavior.

11. Dr. Baselt describes "crashing" as a typical response by heavy cocaine users. A period of cocaine use is followed by a period of depression and sleep from which the user is not easily aroused. This may account for Horwitz' physical appearance and exhausted condition noted by Dr. Risley the morning of the accident.

and lack of preparedness made him late for court, and this, by his own admission, was a direct cause of the accident.

Thus, although substance abuse and injection of cocaine may not have been the proximate cause of the accident, it was certainly more than peripheral. In any event, this is a bar disciplinary proceeding, not a tort action requiring proof of proximate cause. *See generally* W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS § 42 (5th ed. 1984). Although the evidence presented on substance abuse may not have been sufficient to satisfy the causal requirements for second degree murder at the criminal trial,[12] and indeed may not be enough to establish cause in fact in a tort case, that evidence did show that use of illegal substances was part of the causal nexus related to the accident and Horwitz' fitness as a lawyer. Standard 9.22(k) does not specify proximate cause; it specifies crimes involving illegal substances. We conclude that the criminal convictions were based on conduct *involving* use of an illegal substance so that the aggravating factor of Standard 9.22(k) is applicable in selecting an appropriate sanction. Although illegal conduct—negligently crossing the centerline of a road while trying to use the telephone—might not warrant disbarment, we believe the case is quite different when the illegality *involves* the use of cocaine as part of the causal nexus of the crime.

**D. Proportionality**

■ In determining the sanction to impose in a lawyer disciplinary matter, this court has often consulted similar cases to assess proportionality. *In re Struthers,* 179 Ariz. 216, 226, 877 P.2d 789, 799 (1994); *In re Levine,* 174 Ariz. 146, 174–75, 847 P.2d 1093, 1121–22 (1993). Horwitz argues that several courts in other jurisdictions have imposed suspension rather than disbarment in cases somewhat similar to the case at bar. *See, e.g., In re Alkow,* 64 Cal.2d 838, 51 Cal.Rptr. 912, 415

P.2d 800 (1966) (lawyer caused accident killing pedestrian after being refused license due to bad eyesight); *Kentucky Bar Ass'n v. Jones,* 759 S.W.2d 61 (Ky.1988) (attorney driving with blood-alcohol level over .14 collided with truck parked beside highway killing two people); *Office of Disciplinary Counsel v. Michaels,* 38 Ohio St.3d 248, 527 N.E.2d 299 (1988) (lawyer driving with a blood alcohol level of .212 caused an accident killing one person and seriously injuring two others); *In re Curran,* 115 Wash.2d 747, 801 P.2d 962 (1990) (lawyer with blood alcohol level of .18 drove his vehicle off the road killing two passengers).

Several aggravating factors not present in the cited cases distinguish the instant case. One is Horwitz' use of an illegal drug rather than alcohol. *See In re Stein,* 97 N.J. 550, 483 A.2d 109, 117 (1984) (use of illegal substances is an aggravating factor because it involves the commission of a crime). Another important difference is that Horwitz' drug abuse was not an isolated incident, whereas alcohol use by respondents in some of the cited cases was. *See Michaels,* 527 N.E.2d at 300; *Curran,* 801 P.2d at 964. Instead, Horwitz' cocaine use was part of a lengthy pattern of addiction that had degenerated into grossly unprofessional behavior.

Finally, unlike the cited cases, Horwitz had several arrests before and after the fatal accident. These arrests, and the conduct that caused them, distinguish this case from a single tragic but isolated instance of misjudgment by a lawyer in his or her personal life. They show that Horwitz, even after being forcefully put on notice that his conduct was criminal, was unwilling or unable to conform his behavior to the law.

**CONCLUSION**

■ The purposes of professional discipline are to protect the public, the legal profession, and the justice system, and to

---

12. To establish causation in a criminal action, the state must prove, in addition to actual cause (the "but for" rule), that the "relationship between the conduct and result satisfies any additional causal requirements imposed by the statute defining the offense." A.R.S. § 13–203(A). The elements necessary for legal cause in second

degree murder are (1) an act coupled with the intent to cause the death of another; (2) knowing that one's conduct will cause death or serious physical injury; or (3) reckless conduct manifesting extreme indifference to the risk to human life. § 13–1104.

deter others from engaging in misconduct. *In re Neville,* 147 Ariz. 106, 116, 708 P.2d 1297, 1307 (1985); *In re Swartz,* 141 Ariz. 266, 277, 686 P.2d 1236, 1247 (1984). We must also try to instill public confidence in the bar's integrity. *In re Loftus,* 171 Ariz. 672, 675, 832 P.2d 689, 692 (1992).

Horwitz' many years of alcohol and drug abuse, combined with his criminal conduct, weigh heavily for disbarment. His self-destructive acts resulted in the senseless destruction of two lives and forever changed the lives of the families and friends of the two victims. The actual harm, as the Committee noted, "could not have been more severe." Any sanction less than disbarment would be an inappropriate statement of what the bar and this court should and would tolerate.

Further, although we commend Horwitz' desire to rehabilitate himself, life outside prison has not yet tested his resolve to abstain from drugs and alcohol.[13] *Cf. In re Lehman,* 146 Ariz. 166, 166–67, 704 P.2d 807, 807–08 (1985) (Feldman, J., dissenting from order denying readmission to rehabilitated drug user). We also note Horwitz' history of failed attempts at rehabilitation.

After carefully weighing the various factors, we conclude that the aggravating factors, although less numerous, substantially outweigh the mitigating factors and require disbarment.

Therefore, Richard Alan Horwitz is disbarred, effective December 18, 1990, the date he was placed on interim suspension. He is also ordered to pay costs of $1,292.34 to the State Bar.

MOELLER, V.C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

---

13. Should Horwitz' sobriety, good behavior, and rehabilitation continue for a substantial time after release, we would, of course, take this into account in an application for readmission to the bar. *See, e.g., In re Lanahan,* 102 Ariz. 191, 427 P.2d 142 (1967) (readmitting attorney disbarred for alcoholism); *In re Van Bever,* 55 Ariz. 368, 373, 101 P.2d 790, 792 (1940) (" 'While the lamp holds out to burn, the vilest sinner may return,' and it sometimes happens that one who has been disbarred may by his subsequent life convince the court that he is again worthy of being admitted to the practice of law...."). *See generally* Caroll J. Miller, Annotation, *Bar Admission or Reinstatement of Attorney as Affected by Alcoholism or Alcohol Abuse,* 39 A.L.R.4th 567 (1985).

