



FILED
May 11 2020, 10:58 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 19S-DI-156

## In the Matter of
## Curtis T. Hill, Jr.,
*Respondent.*

Decided: May 11, 2020

Attorney Discipline Action

Hearing Officer Myra C. Selby

**Per Curiam Opinion**

All Justices concur.

**Per curiam.**

This matter is before the Court on the report of the hearing officer we appointed to hear evidence on the Indiana Supreme Court Disciplinary Commission's disciplinary complaint filed against Respondent, Curtis Hill. We find, as did the hearing officer, that Respondent committed acts of misdemeanor battery, conduct that under the circumstances of this case violated Indiana Professional Conduct Rules 8.4(b) and 8.4(d).

Respondent's 1988 admission to this State's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4. For Respondent's professional misconduct, we conclude that Respondent should be suspended for 30 days with automatic reinstatement.

# Procedural Background and Facts

Respondent is, and at all relevant times was, the Attorney General of Indiana.

At the conclusion of the 2018 Indiana legislative session, several legislators, lobbyists, and legislative staff attended an event at a local bar. Respondent also attended this event at the invitation of a lobbyist with whom Respondent had been dining and drinking that evening. While at the event, Respondent engaged in acts against four women—a state representative and three legislative assistants—that involved various forms of nonconsensual and inappropriate touching. More specifically, as summarized by the hearing officer, Respondent:

(a) "Touch[ed] [M.R.'s][1] bare back, rubbing his hand down her back down to or just above her buttocks without her consent. He did not accidentally or inadvertently rub [M.R.'s] back down to her mid to low back."

---

[1] In keeping with our customary practice in disciplinary opinions, we refer to the women by their initials.

(b) "Rub[bed] [G.B.'s] back without her consent. He did not accidentally or inadvertently rub [G.B.'s] back."

(c) "Put[ ] his arm around [S.L.'s] waist and pull[ed] her toward him without her consent. He did not inadvertently touch [S.L.] and pull her to him."

(d) "Touch[ed] [N.D.'s] back, moving his hand down her back and moving [N.D.'s] hand toward her buttocks and touching her buttocks without her consent. He did not accidentally or inadvertently touch [N.D.'s] back and move his hand down her back toward her buttocks."

(HO's Report at 25).

Concerns regarding the events at the bar that night eventually were brought to the attention of legislative leaders, who privately commissioned a report ("the Taft Report") from a law firm to examine potential employment law issues in connection with those events. After the report was prepared the legislative leaders met separately with Respondent and with the four women, and Respondent at this juncture was generally apologetic.

Shortly thereafter, the Taft Report was inappropriately leaked to the media by a legislative staffer, and the controversy surrounding the events at the bar became a matter of significant public discussion. In the ensuing days and months, the four women came forward publicly with their accounts of what had happened, and Respondent assembled a group of employees and outside consultants (collectively, "Respondent's team") to assist with his own public response in the wake of the unauthorized disclosure of the Taft Report.

In March 2019, the Commission filed a disciplinary complaint against Respondent alleging that his conduct at the bar violated Indiana Professional Conduct Rules 8.4(b) and 8.4(d) and Indiana Admission and Discipline Rule 22 ("Oath of Attorneys"). The disciplinary complaint also alleged several aggravating factors, including among other things the conduct of Respondent and his team following disclosure of the Taft Report.

A four-day evidentiary hearing was held in October 2019, followed by the parties' submission of post-hearing briefing. The hearing officer issued a detailed 36-page report on February 14, 2020. As discussed further below, the hearing officer found that Respondent violated Rules 8.4(b) and 8.4(d), found in favor of Respondent on the Oath of Attorneys charge, and recommended that Respondent be suspended for at least 60 days without automatic reinstatement. We extend our deep gratitude to the hearing officer for her service and excellent work in this difficult case.

# Discussion and Discipline

Respondent has petitioned for review of the findings and conclusions that he violated Rules 8.4(b) (by committing battery) and 8.4(d). The Commission has not sought review of the hearing officer's determinations that Respondent did not commit sexual battery and did not violate the Oath of Attorneys.[2] Both parties also have briefed the question of appropriate sanction should misconduct be found.

At the outset, we are compelled to note our strong disapproval and extreme disappointment with respect to the tenor of the parties' briefs in this case. The Commission repeatedly refers to Respondent in hyperbolic terms of sexual predation, and the Commission—entirely without support—accuses Respondent of having committed perjury at the final hearing simply because the hearing officer, in endeavoring to reconcile all the testimony (including Respondent's), found that Respondent's conduct amounted to battery. Respondent for his part alternately describes the Commission using terms such as "imperialist," "coddling," "dismissive," and "arrogant," and Respondent devotes far too much of his briefing to

---

[2] The Commission did not file its own petition for review. In a single footnote in its response to Respondent's petition, the Commission "submits" that "the crime of sexual battery was proved . . . [and] a violation of [the Oath of Attorneys] was also proved." (Comm'n Resp. Br. at 20 n.10). Although a party "may raise in its response brief any issues for review that were not raised in the Petition for Review," Admis. Disc. R. 23(15)(a)(3), we decline to revisit the hearing officer's determinations on these two points in light of the Commission's failure to develop any argument on either of them.

entirely unfounded attacks on the Commission's motives and integrity. There are many legitimate legal arguments to be made in this case, which makes the parties' inappropriate *ad hominem* attacks on one another a particularly frustrating distraction. We expect counsel to behave better in future cases.

The Commission carries the burden of proof to demonstrate attorney misconduct by clear and convincing evidence. *See* Ind. Admission and Discipline Rule 23(14)(g)(1). While our review process in disciplinary cases involves a *de novo* examination of all matters presented to the Court, the hearing officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses. *See Matter of Henderson*, 78 N.E.3d 1092, 1093 (Ind. 2017). These time-honored standards guide our discussion below.

**1. Criminality.** Because it bears upon our analyses of both Rules 8.4(b) and 8.4(d) in this particular case, we begin by examining whether the Commission proved by clear and convincing evidence that Respondent committed battery. As relevant here, the criminal act of battery is committed when a person "knowingly or intentionally . . . touches another person in a rude, insolent, or angry manner." I.C. § 35-42-2-1(c)(1).

The "touch" element is easily satisfied in this case. "Any touching, however slight, may constitute battery," *Impson v. State*, 721 N.E.2d 1275, 1285 (Ind. 2000), and Respondent largely acknowledges having made physical contact with the four women. The points of dispute in this case instead have revolved around the manner of that contact and Respondent's intent.

Although the battery statute does not separately define "rude, insolent, or angry manner," these disjunctive terms of art have plain and ordinary meanings readily susceptible of application by a factfinder. *See* https://www.merriam-webster.com/dictionary/rude [https://perma.cc/SE9X-FNRJ] (defining "rude" in part as "lacking refinement or delicacy," "inelegant, uncouth," or "offensive in manner or action: discourteous"); https://www.merriam-webster.com/dictionary/insolent [https://perma.cc/6H9J-LAXW] (defining

"insolent" as "insultingly contemptuous in speech or conduct: overbearing" or "exhibiting boldness or effrontery: impudent").

The hearing officer's report does not include a separate finding that Respondent's manner of touching the four women was "rude," "insolent," or "angry." However, such a finding is clearly implied in the hearing officer's correct articulation of the elements of battery, her ultimate findings and conclusions that Respondent committed battery, and her lengthy and detailed discussion of the testimony regarding the particular manner in which Respondent touched each of the four women. And having reviewed the record, we readily conclude there is ample evidence showing that the manner of Respondent's touches was both "rude" and "insolent." The four women each were clear and unequivocal in their testimony regarding Respondent's specific acts, and to varying extents the acts described by the four women (and the women's reactions in the aftermath of those acts) were witnessed by each other and by other people at the bar.

Turning to the question of *mens rea*, we note that much of Respondent's defense in this case is predicated on the notion that in a social or quasi-social gathering amongst friends or colleagues in a celebratory and somewhat crowded setting, a certain amount of physical contact is *de rigeur* and to be expected. (*See* Tr. Vol. 4 at 59 ("I had contact—I had physical contact with a host of people in connection with meeting them, either shaking hands, putting a hand on their shoulder, putting a hand around a shoulder, around a waist, all incidental to contact communication.")). To be sure, purposeful physical contact can take a variety of forms, and the appropriateness of each form often will depend heavily on both nuance and context. It is precisely because of this variability that we vest responsibility in our factfinders to evaluate "the reasonable inferences based upon an examination of the surrounding circumstances to determine whether—from the person's conduct and the natural consequences therefrom—there is a showing or inference of the requisite criminal intent." *Diallo v. State*, 928 N.E.2d 250, 253 (Ind. Ct. App. 2010) (internal quotation omitted). At the end of the day, whether Respondent possessed the requisite *mens rea* was a question of fact to be determined by the hearing officer; and the long, lingering, and

meandering touches described by the four women and others, the various reactions of those who experienced or observed those touches, and the numerous other accounts of Respondent's conduct at the bar, all offer ample support for the hearing officer's ultimate finding on this point.

In sum, we find and conclude, as did the hearing officer, that the Commission proved by clear and convincing evidence that Respondent committed the criminal act of battery.[3]

**2. Rule 8.4(b).** This Rule provides that it is misconduct to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Our determination that Respondent committed a criminal act, standing alone, is not enough to establish a violation of this Rule. We also must examine the nexus (if any) between that criminality and one or more of the three

---

[3] Respondent draws our attention to the fact that prior to the initiation of these disciplinary proceedings, a special prosecutor issued a report in which he declined to bring criminal charges against Respondent. The report itself was excluded from evidence in this case (a ruling Respondent challenges), but the special prosecutor's ultimate determination nonetheless was established by other evidence. For several reasons though, the special prosecutor's declination of prosecution is of no moment to our analysis. "It is the exclusive province of this Court to regulate professional legal activity." *Matter of Mittower*, 693 N.E.2d 555, 558 (Ind. 1998). "A disciplinary action is not a criminal proceeding; the discipline of a member of the Bar of this State is independently determined from any other proceeding, even if the alleged professional impropriety involves criminal conduct." *Matter of Sheaffer*, 655 N.E.2d 1214, 1217 (Ind. 1995); *accord Matter of Smith*, 60 N.E.3d 1034, 1036 (Ind. 2016). As Respondent himself emphasizes throughout his briefing, criminal, civil, disciplinary, legislative, and electoral accountability mechanisms each have their own distinct aims and purposes. Moreover, a prosecutor may decline to pursue a prosecution for any number of reasons unrelated to whether the subject of the investigation committed a criminal act; and indeed, the special prosecutor's report proffered by Respondent cited some of those reasons. (*See* Pet. for Rev., Ex. 1 at 6 (citing prosecutorial burden of proof of intent beyond a reasonable doubt and the lack of a public benefit to criminal prosecution under these circumstances)). Further, Respondent concedes, in reference to a prior disciplinary case, that an attorney's "acquittal would not have barred a discipline charge based on Rule 8.4(b) because acquittal only signifies the existence of reasonable doubt rather than the absence of clear-and-convincing evidence." (Br. in Supp. of Pet. for Rev. at 31 n.15 (citing *Matter of Mears*, 723 N.E.2d 873 (Ind. 2000))). If an acquittal based on an adjudged lack of proof beyond a reasonable doubt does not preclude a Rule 8.4(b) charge, it follows that a declination of prosecution based on a perceived lack of proof beyond a reasonable doubt fares no differently.

characteristics enumerated in the Rule—honesty, trustworthiness, or "fitness as a lawyer in other respects." And as the parties have done in their briefing, we focus our attention here on the fitness element.

Our leading case addressing this nexus requirement is *Matter of Oliver*, 493 N.E.2d 1237 (Ind. 1986). That case involved an attorney who crashed his car into a tree after driving while intoxicated ("OWI") on his way home from a bar, was charged with misdemeanor OWI, pled guilty, and had acceptance of the plea withheld pending successful completion of community service and other conditions of an informal probation. Oliver was charged with violating three provisions of our former Code of Professional Responsibility. One was the predecessor to what is now Rule 8.4(d), which we discuss below. The other two provisions addressed, respectively, illegal conduct involving "moral turpitude" and conduct adversely reflecting on fitness to practice. These two Code provisions later were consolidated into Rule 8.4(b), with the "moral turpitude" component being replaced with the three specific characteristics now enumerated in Rule 8.4(b).

In finding no violation of the Code provision addressing criminal conduct involving moral turpitude, we emphasized the "objective of the rule" over the "problem of definition" and noted that Oliver was not a multiple offender or someone with a chronic alcohol problem, his criminal act was isolated and did not result in any personal injury or property damage except to himself, and he had readily admitted his guilt and successfully discharged the conditions of his informal probation. *Oliver*, 493 N.E.2d at 1241. We likewise found no violation of the Code provision addressing conduct adversely reflecting on fitness to practice after finding that the evidence adduced in that case "demonstrated that Oliver's sole act did not affect his practice or lead to any reasonable question about his suitability as a practitioner[.]" *Id.* at 1242-43.

The principles articulated in *Oliver* survived the adoption of the Rules of Professional Conduct, *see Matter of Eddingfield*, 572 N.E.2d 1293, 1295 (Ind. 1991), and are encapsulated in our Commentary to Rule 8.4:

> Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses

that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

These principles likewise are reflected throughout our post-*Oliver* disciplinary jurisprudence. Crimes involving theft, fraud, or the like—even if they involve an isolated act committed outside of one's legal practice—have been held to be attorney misconduct because they inherently bear on an attorney's honesty or trustworthiness. *See, e.g.*, *Matter of Page*, 8 N.E.3d 199 (Ind. 2014) (attorney aided and abetted fraud in connection with a loan application). Crimes of violence—even those involving a single act committed outside of one's legal practice—have been held to be attorney misconduct on the premise that such an act bears on "fitness as a lawyer in other respects." *See, e.g.*, *Matter of Smith*, 97 N.E.3d 621 (Ind. 2018) (attorney committed felony intimidation against his estranged wife); *Matter of Coleman*, 67 N.E.3d 629 (Ind. 2017) (attorney committed domestic battery of wife in presence of four children). And of course, crimes committed by an attorney during the performance of his or her legal work have been treated as having an immediate and self-evident nexus to the attorney's fitness to practice law. *See, e.g.*, *Matter of Robertson*, 78 N.E.3d 1090 (Ind. 2016) (attorney committed OWI while driving to the courthouse for a scheduled hearing and battery against a court receptionist); *Matter of May*, 992 N.E.2d 684 (Ind. 2013) (attorney battered his client in the courthouse after a hearing).

In certain circumstances, an attorney's particular field of practice also has informed our nexus analysis. For example, in *Matter of Walker*, 597 N.E.2d 1271 (Ind. 1992), a part-time prosecutor who also practiced in family law committed domestic battery against his partner. In finding a violation of Rule 8.4(b) and rejecting Walker's argument that the requisite nexus was lacking because the battery arose as part of a "private, adult relationship," we observed that Walker's act of domestic battery "calls into question his ability to zealously prosecute or to effectively work with the victims of such crimes" and similarly compromised his effectiveness

with his private clients or with adversaries in situations involving issues of domestic violence. *Id.* at 1272.

Other jurisdictions have wrestled with similar questions. Some decisions have highlighted the deleterious effect any violation of the law necessarily has on the perception of individuals whose tradecraft is premised upon respect for, and adherence to, the rule of law. *See, e.g.*, *Matter of Horwitz*, 180 Ariz. 20, 24, 881 P.2d 352, 356 (1994) ("[T]he public has a right to expect that lawyers will, in general, live as law-abiding citizens"). Other decisions have focused on how an attorney's criminality bears on his or her ability to perform discrete legal tasks, drawing parallels between "fitness" and "competency." *See, e.g.*, *Matter of Disciplinary Proceeding Against Curran*, 115 Wash.2d 747, 768, 801 P.2d 962, 972 (1990) ("The rule is not concerned with maintaining public confidence in the bar by disciplining lawyers harming the public image of the bar. Rather, it is concerned with protecting the public from incompetent practitioners"). And still others have focused on an attorney's professional duties writ large. *See, e.g.*, *Matter of Peters*, 428 N.W.2d 375, 380 (Minn. 1988) ("A lawyer's professional capacity, moreover, extends well beyond the attorney-client relationship, and it seems to us abundantly clear that a law school dean or law professor acts in the professional capacity of a lawyer in dealing with the law school's students and staff").

The pragmatic line drawn by *Oliver* and its progeny reflects measured consideration of all of these concerns and recognizes that the purposes of attorney discipline include both the need to protect the public and the need to preserve public confidence in the legal system. It also is consistent with our bar admission standards, which require separate demonstrations of both competency and fitness. *See* Ind. Admis. Disc. R. 12. The *Oliver* doctrine has served Indiana well for over three decades, and neither the Commission nor Respondent asks us in these proceedings to revisit it.

Accordingly, we turn to the question presented here: Do Respondent's criminal acts of battery against the four women during the event at the bar have the requisite nexus to his fitness as a lawyer to be actionable under Rule 8.4(b)?

Echoing our earlier discussion of criminality, we note that although the hearing officer's report does not include an explicit finding of a nexus within her discussion of Rule 8.4(b), such a finding is clearly implied in the hearing officer's correct articulation of the elements of Rule 8.4(b), her ultimate findings and conclusions that Respondent violated this Rule, and her detailed findings and conclusions elsewhere in her report addressing the relationship between Respondent's professional role and his attendance and conduct at the bar.

Much like the part-time prosecutor who committed domestic battery in *Walker*, Respondent argues that the event at the bar was a private function disconnected from his practice of law or the performance of any act formally within the scope of his office. Indeed, several attendees testified that the party was an unofficial and informal event to celebrate the end of the legislative session. However, whether something is "unofficial" or "informal" does not answer the question of whether it involved the performance of the attorney's professional duties.

The hearing officer found generally that "the important business of developing and nurturing goodwill by and between legislators, legislative staff and lobbyists occurs at the party," and found more specifically that "Respondent went to the party intending to conduct some business with key legislators about a bill that concerned the Office of Attorney General." (HO's Report at 22-23). These findings are borne out by Respondent's own testimony during the final hearing:

> That piqued my interest after [the lobbyist] invited me to the party because it was my understanding that perhaps Senator Taylor would be there and I thought it would be great to go in and thank him for being the champion for trying to oppose that particular bill.
>
> . . . [F]rom my standpoint it was an opportunity to go in and not only see Senator Taylor and thank him for his efforts but also to continue to do what I try to do everywhere and that's build relationships. I understood that there were going to be legislators there. In my tenure there are several legislators that I've met, there are several more that I've not met and it's always good to have relationships and so I thought it was a great opportunity to go say

"hello" to old friends, meet new friends, and continue to do what I do in terms of connect.

(Tr. Vol. 4 at 21-22, 25). And Respondent similarly described in work-related terms his motivations and conduct while at the party:

> I had some conversations, I recall having a conversation with Jeff Phillips, who's a lobbyist, talking about the function of the office. In particular I had a conversation with Senator Taylor, I did track him down and we sat down at the bar and spoke for several minutes about what had happened that evening at the General Assembly, and of course I did thank him for that. I sat down and talked to Senator Randolph, Lonnie Randolph, and a few more I spoke to, Senator Mishler. Senator Mishler, when he saw me, he introduced me to some of the folks he was with, but he made a point of letting me know that he was prepared to work with us moving forward, despite the fact that his bill was passed and the outcome, he wanted to assure me that we were going to continue to work together and that there would be access for my office to funds to, I don't want to say replace, but to basically make up for any needs that we required.
>
> . . . [I also did] a lot of what I would call quick-hits, "How are you? What's your name? What do you do?" and then move on, much like when I work a political event and my purpose is to meet as many people as possible.

(*Id.* at 30-31).

Respondent's own testimony brings his criminal conduct directly within the ambit of the performance of his professional duties. Respondent went to the party with the purpose of discussing a bill affecting his office with key legislators and nurturing goodwill, he spent time at the party doing precisely these things, and while there he committed battery against a legislator and three legislative staffers. The nexus in this case is little different than the nexus in *Robertson* (OWI on the way to the courthouse for a hearing and battery on a court receptionist) or

in *May* (battery in the courthouse following a hearing), and it is more than sufficient to establish a violation of Rule 8.4(b).

**3. Rule 8.4(d).** This Rule proscribes engaging "in conduct that is prejudicial to the administration of justice." Once again, our discussion is guided by *Oliver* and its progeny.

Although we found the requisite nexus between fitness and criminality to be lacking in *Oliver* based on the evidence adduced in that case, we nonetheless concluded that Oliver's criminal act of OWI violated the proscription against conduct prejudicial to the administration of justice because Oliver was serving in a prosecutorial role at the time he committed his criminal act:

> The duty of judges and prosecutors to conform their behavior to the law does not arise solely out of their status as attorneys. As officers charged with administration of the law, their own behavior has the capacity to bolster or damage public esteem for the system different than that of attorneys otherwise in practice.

*Id.* at 1242. In the years since *Oliver*, we have consistently held that criminal conduct committed by prosecutors or their deputies is conduct inherently prejudicial to the administration of justice due to their status as "officers charged with administration of the law." Further, we have applied this same principle to a deputy attorney general. *Matter of Junk*, 815 N.E.2d 505 (Ind. 2004).

Noting that *Junk* was an agreed disposition, Respondent briefly argues in a footnote that an Attorney General should be treated differently than a prosecutor under the *Oliver* doctrine because the Attorney General in most instances does not directly charge crimes. (Br. in Supp. of Pet. for Rev. at 43 n.20). But Respondent does not explain how exercising the broad statutory authority of the office to assist prosecutors and crime victims, and defending convictions on appeal on behalf of the State, are meaningfully different in terms of the administration of justice than charging and prosecuting those crimes on behalf of the State; or how, in *Oliver*'s parlance, the Attorney General is not also an "officer[ ] charged with administration of the law." In fact, the Attorney General's role in the

administration of justice—which extends statewide and encompasses a wide range of criminal, civil, administrative and regulatory matters— greatly exceeds that of a county prosecutor. *See generally* I.C. § 4-6-1-6 (setting forth rights, powers, and duties of Attorney General). Put simply, the Attorney General is the "chief legal officer of the State of Indiana." (Tr. Vol. 3 at 102).

In short, the Attorney General is an "officer charged with administration of the law" at least to the same extent as a prosecutor, if not substantially more so. Accordingly, Respondent's criminal conduct was prejudicial to the administration of justice, in violation of Rule 8.4(d).

**4. Sanction**. Isolated misdemeanor acts of OWI or public intoxication committed by those in prosecutorial roles frequently have been sanctioned by public reprimand. *See, e.g.*, *Matter of Janeway*, 981 N.E.2d 548, 549 (Ind. 2013) (OWI by deputy prosecutor); *Junk*, 815 N.E.2d at 506 (OWI by deputy attorney general); *Matter of McFadden*, 729 N.E.2d 137, 138 (Ind. 2000) (public intoxication by deputy prosecutor). Acts of misdemeanor battery committed by attorneys have garnered either a public reprimand or short suspension with automatic reinstatement. *See, e.g.*, *May*, 992 N.E.2d at 685 (60-day suspension with automatic reinstatement for battery committed by attorney against client); *Matter of Scott*, 989 N.E.2d 1249 (Ind. 2013) (public reprimand for domestic battery by attorney); *Walker*, 597 N.E.2d at 1272 (60-day suspension with automatic reinstatement for domestic battery committed by part-time prosecutor).[4] We think this line of cases serves as a useful starting point for the question of appropriate sanction here.

The hearing officer similarly recommended a 60-day suspension here. However, she recommended that suspension be served without automatic

---

[4] Disciplinary actions against judges for similar acts committed in violation of our Code of Judicial Conduct have reached similar results. *See, e.g.*, *Matter of Adams, et al.*, 134 N.E.3d 50 (Ind. 2019) (60-day suspension for judge who committed misdemeanor battery and 30-day suspensions for two other judges who participated in the same incident at levels falling short of criminality); *Matter of Page*, 69 N.E.3d 470 (Ind. 2017) (public reprimand for OWI); *Matter of Hughes*, 947 N.E.2d 418 (Ind. 2011) (same).

reinstatement, based largely on actions taken by Respondent and members of his team in the wake of the unauthorized disclosure of the Taft Report, actions the hearing officer viewed as significantly aggravating in nature.

Because those actions are established in the record primarily through a series of emails and attachments admitted into evidence over Respondent's objection, and Respondent has renewed those objections in his petition for review, we must first briefly address the admissibility of those exhibits. Prior to and during the final hearing, Respondent alternately objected to these emails on grounds of hearsay, relevance, and attorney-client privilege. Rather than developing these arguments with respect to each email in his petition for review though, Respondent merely incorporates a chart listing each item and each ground for objection. (Br. in Supp. of Pet. for Rev. at 20 & Ex. 2). We likewise need not pause long on the admissibility of each individual email, and we find the hearing officer did not abuse her discretion in admitting them. Respondent's claim of privilege, based on the notion that the emails contain legal advice rendered to him in his capacity as Attorney General by counsel within his office, is fundamentally at odds with Respondent's insistence that only his private conduct is at issue and that his office employees participated in these team endeavors on their own personal time, using their own private email accounts, and in their personal capacities as Respondent's political supporters. Simply put, Respondent cannot have it both ways. Respondent's hearsay objections likewise are unpersuasive because the emails were not admitted for the truth of the matters asserted therein but rather the implications that may be drawn from them regarding Respondent's alleged lack of insight or remorse into his misconduct. And for this same reason, these emails are relevant enough to factors bearing on sanction to survive an admissibility challenge.

However, upon careful review of these emails and attachments, we find them only minimally relevant to the question of an appropriate sanction. Importantly, Respondent's own degree of participation in the email chains admitted into evidence is minimal and perfunctory. And while several emails indeed reflect extremely poorly on various members of

Respondent's team,[5] there is little evidence linking those team members' musings to Respondent's direction beyond whatever presumption might be drawn from the agency relationship. The Commission argues it "strains credulity" to believe "that Respondent was not in control of what his team was doing on his behalf[.]" (Resp. to Pet. for Rev. at 27 n.13). While this is undoubtedly true in a general sense, we do not believe Respondent is personally responsible for every poor word choice or ill-conceived idea proposed by individual team members in emails or draft documents, many of which were voted down by other team members and never made their way into publicly-disseminated materials.

We also find that certain actions taken by team members—and, with some exception, Respondent's own actions—were intended to address the particular process that led to the public accusations against Respondent rather than to directly impugn the credibility of the four women themselves. All involved in this process—the four women, Respondent, and legislative leaders—appropriately decried the unauthorized leaking of the Taft Report by a legislative staffer. Respondent's public criticisms of that process are valid and do not speak to any negative characteristics relevant to sanction. The Taft Report was privately commissioned by legislative leaders to examine potential employment-law issues arising from the events of the party. Its purpose was not to test the credibility of the four women or to conduct a detailed factual investigation against Respondent. Yet, when the report was leaked into the public domain, it was received by the public as a report finding and exposing misconduct

---

[5] These include press releases drafted by one team member and edited by another intended to "expose [N.D.]" (Ex. 15-16); another team member's suggestion to refer to declarants and others involved with the Taft Report commissioned by the Legislature as "Leakers and Liars" (Ex. 24-27); a rejected suggestion by a team member to refer to the allegations against Respondent as a "lynching" (Ex. 28); phony letters to the editor and editorials drafted by team members (Ex. 35-37, 39, 57-58); and hired consultants' suggestion after the Commission filed its disciplinary complaint against Respondent to dig up negative background on Commission members and then "shop portions of research enclosed no fingerprints to national conservative outlet to generate piece that friends would use with grassroots folks," to which a team member within the Attorney General's office responded "I think it would be a good idea" (Ex. 56).

by Respondent. Respondent was fully entitled at this point to mount a public defense against the process that led to the matter being inappropriately released into the public domain. And to the extent Respondent's public defense also involved a simple, straightforward denial of some of the behaviors attributed to him in the Taft Report, he was entitled to do that as well.[6]

However, in terms of his own direct actions, Respondent went a step too far in decrying the allegations against him as not only "false" but "vicious" in a press release issued shortly after the Taft Report was leaked. (Exs. 1-2). Read in context, Respondent's use of the word "vicious," bookended by references to the allegations against him, implied malice or bad faith by the four women. Respondent claimed at the final hearing that his use of the term "vicious" was directed at the process and not at the individual accusers (Tr. Vol. 4 at 176), but the hearing officer was not persuaded and we defer to her first-hand assessment of that testimony.

Respondent also went a step too far in issuing a subsequent press release in which he drew attention to, and published, a message written by N.D. to a friend but mistakenly sent to an email account associated with the Office of Attorney General. (Ex. 7). In that press release, Respondent referred to N.D.'s account as a "draft story" and an "editorialized . . . recollection of events," and Respondent characterized the email as evidence of "various stories . . . coordinated and changed under the direction of others." (*Id.*) Like Respondent's use of the word "vicious" in the earlier press release, this press release in context contains a clear implication of malice and bad faith by the women and not mere disagreement regarding the substance of the accusations. Moreover, as observed by the hearing officer, Respondent's gratuitous publication of N.D.'s email "could serve only to intimidate [N.D.] and anyone else thinking of stepping forward." (HO's Report at 35).

---

[6] As noted by the hearing officer, "[n]either the Respondent nor [the four women] were satisfied with the accuracy of the Taft Report." (HO's Report at 16 n.2).

In sum, we find Respondent's actions in the wake of the disclosure of the Taft Report do carry some aggravating weight, but not to an extent that entails the type of wholesale lack of insight or lack of remorse that ordinarily would prompt us to require a respondent attorney to undergo the reinstatement process in order to prove his fitness to resume the practice of law. Many of our past disciplinary dispositions have not had occasion to expound in great detail upon an attorney's demonstrations of insight or remorse, or lack thereof, and have simply cited the aggravating or mitigating factor without further discussion. Respondent correctly observes, though, that questions of insight and remorse in many cases are more appropriately weighed on a spectrum rather than as binary, all-or-nothing propositions. (*See* Respondent's Reply Br. at 8). This is one of those cases. Although Respondent strayed past an appropriate line in some of his conduct after the Taft Report was leaked, he was apologetic in his initial discussions with legislative leaders before the leak, and in a press release after the leak Respondent maintained his innocence but simultaneously emphasized that "[v]ictims of sexual abuse and/or sexual harassment deserve to have their voices heard." (Ex. 3).

The hearing officer's report and the parties' briefs point to additional factors that are aggravating or mitigating to varying degrees. Respondent's acts of misconduct were committed against four women, albeit on a single occasion. The victims have suffered significant harm that, while certainly exacerbated by other events, was caused most proximately by Respondent's misconduct. Respondent's substantial experience in the practice of law, almost all of which has been spent in a prosecutorial capacity, counsels that he should have known better than to conduct himself at the bar in the manner he did; but that same experience, consisting of roughly three decades of public service without prior discipline, also carries mitigating weight.

At the end of the day, Respondent urges that "similar cases should be treated similarly" and that we should treat him no better or no worse than any other attorney. (Br. in Supp. of Pet. for Rev. at 51-52). In light of our consideration of the nature of Respondent's misconduct, the aggravating and mitigating circumstances, and the short suspensions with automatic reinstatement we imposed on the attorney who battered his client (*May*),

the prosecutor who battered his romantic partner (*Walker*), and the judge who battered a third party (*Adams*), we conclude that a similar result should obtain here.

# Conclusion

The Court concludes that Respondent violated Professional Conduct Rules 8.4(b) and 8.4(d). The Court finds in favor of Respondent on the Oath of Attorneys charge.

For Respondent's professional misconduct, the Court suspends Respondent from the practice of law in this state for a period of 30 days, beginning May 18, 2020. Respondent shall not undertake any new legal matters between service of this opinion and the effective date of the suspension, and Respondent shall fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26). At the conclusion of the period of suspension, provided there are no other suspensions then in effect, Respondent shall be automatically reinstated to the practice of law, subject to the conditions of Admission and Discipline Rule 23(18)(a). The costs of this proceeding are assessed against Respondent, and the hearing officer appointed in this case is discharged with the Court's appreciation.

All Justices concur.

ATTORNEYS FOR RESPONDENT
Donald R. Lundberg
James H. Voyles
Jennifer M. Lukemeyer
Indianapolis, Indiana

ATTORNEYS FOR INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
Charles M. Kidd, Acting Executive Director
Seth T. Pruden, Staff Attorney
Angie Ordway, Staff Attorney
Indianapolis, Indiana